ORIGINAL                                    1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------X
     TOM OGNIBENE, et. al.,
 3
                                    PLAINTIFFS,
 4
                   -against-        CA. No:
 5                                  08CV0335(LTS)(TDK)

 6   SCHWARTZ, et. al.,

 7                                  DEFENDANTS
     ------------------------------------------X
 8

 9

10              DATE: June 19, 2008

11              TIME: 3:00 p.m.

12

13        DEPOSITION of the Plaintiff, YVETTE VELAZQUEZ BENNETT,

14   taken by the Defendants, pursuant to a Court Order and the

15   Federal Rules of Civil Procedures, held at the offices of MICHAEL

16   A. CARDOZO, ESQ., Corporation Counsel, 100 Church Street, New

17   York, New York 10007, before KATE FRANCOMACARO, a Notary Public

18   of the State of New York.

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2

 3       BOPP, COLESON & BOSTROM, ESQS.
             Attorneys for the Plaintiffs
 4           1 South 6th Street
             Terre Haute, Indiana 47807-3510
 5       BY: JOE LA RUE, ESQ.

 6


 7
         MICHAEL A. CARDOZO, ESQ.
 8       CORPORATION COUNSEL
             Attorneys for the Defendants
 9           CITY OF NEW YORK
             100 Church Street
10           New York, New York 10007
             BY: LISA GRUMET, ESQ.
11           File #: 2008004838
             Control #: III02268
12

13
     ALSO PRESENT:
14       HILLARY WEISMAN
         EUGENE MEYERS
15       CORINNE GENTILESCO

16           *              *              *

17

18

19

20

21

22

23

24

25
```

1     Y V E T T E     V E L A Z Q U E Z     B E N N E T T, called as a

2     witness, having been first duly sworn by a Notary Public of the

3     State of New York, was examined and testified as follows:

4     EXAMINATION BY

5     MS. GRUMET:

6         Q.    Please state your name for the record.

7         A.    Yvette Velazquez Bennett.

8         Q.    Where do you reside?

9         A.    At 1622 10th Avenue, Brooklyn, New York 11215.

10              MS. GRUMET:  I just want to state for the record

11    that this deposition is addressed to the claims raised in the

12    Plaintiff's preliminary injunction motion and that it's deemed

13    continuing for the purposes of the remainder of this litigation.

14        Q.    I am to go going to be asking you questions this

15    morning about your claims in this lawsuit.  Have you taken a

16    deposition before?

17        A.    No.

18        Q.    You are going to be answering the questions that I ask,

19    under the oath of the court reporter.  The court reporter

20    prepares a transcript of the deposition which you will have an

21    opportunity to review.  It's important that if I ask a question

22    that you don't understand, whether because you don't hear me or

23    the question is unclear, let me know and I will repeat or

24    rephrase the question.

25        A.    Yes.

1    A.    It's recruiting more people to get involved in
2    particular with the Republican Party.  As I am a Republican,
3    recruiting people to also work poll sites helping to build a
4    Party.  Also, when people get involved with the election process,
5    is gets them excited and willing to do more and that's part what
6    of I do, too.
7    Q.    And you made reference earlier to the Republican Party
8    platform?
9    A.    Yes.
10   Q.    Is there anything in that platform that relates at that
11   Republican campaign?
12   A.    No.
13   Q.    Did you work at the Republican national convention?
14   A.    I was a volunteer.
15   Q.    What were your responsibilities there?
16   A.    Site operations.  I worked with the secret service and
17   security detail at the convention site.
18   Q.    And what offices have you run for?
19   A.    I ran for City Council in 2005 and in 2006 I ran for
20   state assembly.
21   Q.    Are you currently running for office?
22   A.    Yes, for State Assembly now.
23   Q.    For 2008?
24   A.    Yes.
25   Q.    What are your claims in this litigation?

1   A.   My claims in this litigation is the way the new law or
2   the way it's written prevents key people from donating to my
3   campaign.  It prevents adequate funding for a campaign that would
4   be viable.  There is no way that I can run against an incumbent,
5   especially me without the proper finances for a campaign.
6   Q.   And what do you mean by "key people," when you say it
7   prevents key people from donating to your campaign?
8   A.   People involved with the City.  I have friends who work
9   with the City.  They would be unable to donate.
10   Q.   What do you mean by, "work with the City"?
11   A.   Contractors.  They may have worked with the City in the
12   past and are not currently working with the City.  I don't know
13   if I can really answer that any better.
14   Q.   What is your understanding of who is subject to lower
15   contribution limits under the Campaign Finance Law?
16   A.   Can you clarify that?
17   Q.   What is your understanding of who may be restricted in
18   the amount of money they can give you and the Campaign Finance
19   Law?
20   A.   When I ran last time, I had a tough time raising money
21   as it was my scope of potential donors.  Because my experience
22   now is greater, among those donors are people who -- let me make
23   sure I am answering this question correctly.  Can you repeat the
24   question again?
25   Q.   The people who are involved with the City.

1    A.   I am not sure I know how to answer that beyond that.

2  What I understand is they have contracts with the City. It's

3  just that my scope of potential donors has grown. I know more

4  neighbors now. You walk down the street, you have people who are

5  involved with the City.

6    Q.   How did you become involved with this litigation?

7    A.   I was called by the Chairman of the Conservative Party

8  in Brooklyn and he explained this lawsuit to me and he indicated

9  that they were looking for Plaintiffs. Is that the word, the

10 correct word?

11   Q.   Yes.

12   A.   And when we he explained it, I totally agreed with the

13 premise. He asked me to think about it and then he contacted Mr.

14 Bopp's firm and Joe gave me a call and he explained the lawsuit

15 and I was on board. From what I remember of our conversation, he

16 had made it clear that I was a good person to participate in this

17 process.

18   Q.   And who is the chair of the Conservative Party?

19   A.   Jerry Kassar.

20   Q.   And did he explain why he thought that you would be a

21 good person to be a Plaintiff in the lawsuit?

22   A.   I don't recall.

23   Q.   Do you know who is financing the lawsuit?

24   A.   I don't recall. I remember seeing a list, but I don't

25 recall.

BENNETT

10

1   Campaign Finance Board to at least go back to the levels that I
2   experienced in 2005, with those restrictions.  They are much more
3   severe now.  I would like to see it better than that.
4       Q.  What do you mean when you say you would like to see it
5   better than that?
6       A.  I find the campaign finance rules restrictive.
7       Q.  How so?
8       A.  I find the filings, the detail required, to be
9   unnecessary in my opinion.  If I want to buy five dollars worth
10  of staples, I should be able to, I believe, to do that freely.
11      Q.  Do you intend to run in the 2009 election?
12      A.  No.
13      Q.  Why is that?
14      A.  The restrictions on the campaign finance is
15  prohibitive, too restrictive in terms of how much I can raise.  I
16  don't think I can adequately run a campaign with the small amount
17  of money I can raise.
18      Q.  Would there be an incumbent for the 2009 City Council
19  race for your district?
20      A.  I believe so, yes.
21      Q.  Who would that be?
22      A.  James Brennan.  Sorry.  Wrong race.  There will be no
23  incumbent.
24      Q.  Who is James Brennan?
25      A.  My current opponent.  I have James Brennan on the mind.

1    Q.    What has your fund-raising experience been like for
2  your current race and, just to clarify, for the 2008 Assembly
3  race?
4    A.    We are still gearing up.  I expect to have a
5  fund-raiser in another six to eight weeks.  I have some money in
6  a kitty from my prior race and that's what I am going using to
7  get that started.
8    Q.    And just in to clarify, why will there be no incumbent
9  for the 2009 Council race for your district?
10   A.    He is term limited out.
11   Q.    Who is the current incumbent?
12   A.    Bill Debrazzio.
13   Q.    Did you participate in public financing in the 2005
14 election?
15   A.    I did not raise enough.
16   Q.    Did you seek to participate in the public financing in
17 the 2005 election?
18   A.    Yes.
19   Q.    Why was that?
20   A.    Five thousand dollars was not going to be enough which
21 is what I figured I could raise at the time.  To run a race, if I
22 met that five thousand dollar threshold, I would have matched the
23 funds and have a better chance against the incumbent.
24   Q.    In your experience, does the possibility of matching
25 funds help you in raising funds from individuals?  I will

BENNETT

12

1  rephrase the question.  In your experience, are individuals more
2  likely to contribute to your campaign if they believe their funds
3  will be matched?
4      A.  Yes, in some cases.
5      Q.  Why is that?
6      A.  Some people think that they will be getting more bang
7  for their contributed dollar.
8      Q.  Does it help you to raise funds from people who donate;
9  does the possibility of matching funds, in your experience, help
10 you to raise money from individuals who cannot afford to
11 contribute a lot of money?
12     A.  Yes.  Can I clarify that?  It would be a small number
13 of people.
14     Q.  What do you mean by that?
15     A.  Many of the people wouldn't care whether there was
16 matching funds.  They are giving me something that they think is
17 a means of appreciating me, my campaign, whether it's matched or
18 not.  I would say a majority of people, but there are some.  If
19 there is some money being matched, they might feel their dollar
20 is worth more, but I wouldn't say a lot of them.
21     Q.  How do you go about raising funds for a campaign?
22     A.  I have used fund-raisers and I did one solicitation
23 letter.
24     Q.  What kind of fund-raisers?
25     A.  Usually at a restaurant or a neighborhood hall.  We

1    A.   Yes.

2    Q.   And how did you decide who to include in the document?

3    A.   My personal phonebook.

4    Q.   Do you know if any of the persons on the list that's

5    been identified as Exhibit G have business dealings with the City

6    of New York?

7    A.   I don't know.

8    Q.   Do you know if any of the persons on the list that's

9    been identified as Defendants' Exhibit G are lobbyists?

10   A.   Not to my recollection.

11   Q.   Who was your opponent in the 2005 election for council?

12   A.   Bill Debrazzio.

13   Q.   What was the outcome of the election?

14   A.   I don't recall.  I did not win.

15   Q.   So Mr. Debrazzio won?

16   A.   Yes.

17   Q.   In your opinion, why did he win the election?

18   A.   How much time do we have?  First and foremost, he is

19   the incumbent.  He has the luxury of being able to send out lots

20   of mailings of things that he is doing within the community.  You

21   need money to be able to counteract that.  I didn't have the

22   money to do.

23            (Whereupon, the aforementioned document was marked

24   as Defendants' Exhibit H for identification as of this date by

25   the Reporter.)

1    Q.   Do you recognize the document that's been marked as
2  Defendants' Exhibit H?
3    A.   Yes.
4    Q.   And what is that document?
5    A.   It's a fund-raising letter that I wrote and sent to
6  this list of people (indicating).
7    Q.   The list of people meaning Defendants' Exhibit G?
8    A.   That's correct.
9    Q.   I would like to direct your attention to the second
10 page of the document, Defendants' Exhibit H, and looking at the
11 fourth paragraph from the bottom, beginning "most importantly,"
12 and I am going to read that paragraph.
13         "Most importantly, all of the major players in the
14 Party are watching to see how much money I am able to raise in
15 the campaign to decide if they want to target me for assistance.
16 If they do, it will make a huge difference.  If they don't, I am
17 afraid all the special interest money bill Mr. Debrazzio will
18 spend will simply overwhelm me."
19         Did you write that paragraph?
20   A.   I certainly did.
21   Q.   What did you mean by "major players in the Party"?
22   A.   The chairman, the executive committee, they can make
23 recommendations for people to donate to my campaign.
24   Q.   And what do you mean, they can make recommendations for
25 people to donate?

1      A.    There is only so much money that the Party has.  They

2   have to be able to give it to the campaign that can best make use

3   of the money.  My goal was to show I was a good investment and

4   that they could trust to use their money on my campaign.

5      Q.    Did the Party provide financial assistance to your

6   campaign for City Council in 2005?

7      A.    No.

8      Q.    Did the Party provide assistance for your Assembly

9   campaign in 2006, financial assistance?

10     A.    Yes.

11     Q.    Do you know why they provided in 2006 and not in 2005?

12     A.    I believe there were two reasons.  One is, even though

13  I did not raise a lot of money for the City Council campaign, I

14  doubled the results of the prior Republican candidates running

15  for that seat and they were impressed.

16     Q.    And has the Republican Party provided financial

17  assistance for your current campaign for Assembly?

18     A.    I expect them to.

19     Q.    How much financial assistance would the Party

20  ordinarily provide for a Council race, to your knowledge?

21     A.    I don't know.

22     Q.    Going back to Defendants' Exhibit H, when you referred

23  to the special interest money Mr. Debrazzio will spend, what did

24  you mean by that?

25     A.    I am trying to think how to answer this question.  I

1  really don't know how to answer that question. Give me a
2  moment. I guess special interest money would be money from
3  organizations that would be contrary to my own interests.
4       Q.   Did Mr. Debrazzio raise more money than you did for
5  that campaign?
6       A.   Yes.
7       Q.   In your view, why was Mr. Debrazzio able to raise more
8  money than you were for the 2005 Council race?
9       A.   Because he would find donors to donate in one lump sum
10 more than I could raise for my entire campaign.
11      Q.   What do you mean by that? Who was he able to find as
12 donors?
13      A.   I can't answer that question at this point. That would
14 be public record, wouldn't it?
15      Q.   Do you know whether Bill Debrazzio had support from
16 persons who had business dealings with the City in his 2005
17 campaign?
18      A.   I don't know.
19      Q.   To your knowledge, did Bill Debrazzio have support from
20 lobbyists in his 2005 campaign?
21      A.   I don't know.
22      Q.   In your view, did Mr. Debrazzio's status as an
23 incumbent help him in raising funds for the 2005 Council race?
24      A.   Absolutely.
25      Q.   How so?

1   A.   I think I answered that question. His access to
2   literature to send to the community.
3   Q.   Did that help him in raising funds?
4   A.   Yes.
5   Q.   Is there any other aspect of Mr. Debrazzio's incumbency
6   that you feel may have helped him raise funds in the 2005 Council
7   race?
8   A.   Incumbency also gives you access and visibility that I
9   did not have.
10  Q.   What do you mean by access?
11  A.   He gets the press releases from community events so
12  that he can be there. I do not.
13       (Whereupon, a short recess was taken.)
14       MS. GRUMET: Nothing further.
15       MR. LA RUE: I would like her to clarify one
16  answer.
17  A.   You asked me about special interest money and you asked
18  me to explain special interests, to clarify. Special interest
19  groups are groups that have used money outside of the
20  conservative ideology in my opinion.
21       MR. LA RUE: Do you want her to do another
22  clarification?
23       MS. GRUMET: Sure.
24  A.   The other clarification is I don't know for sure if
25  anybody that I solicited has business with the City. However,

1   one person on the list, it's possible that he may have had

2   business with the City.  I don't know for sure.

3       Q.  And what kind of business with the City?

4       A.  He is a contractor and he also handles real estate and

5   I know he has bought foreclosed homes perhaps from the City.  I

6   am not sure where and then he fixes them up and resells them so I

7   don't know for sure if he has business with the City, but it's

8   possible.

9           MS. GRUMET: Thank you.  Nothing further.

10          (Whereupon, at 4:05 p.m., the Examination of this

11  Witness was concluded.)

12

13                          _____

14                          YVETTE VELAZQUEZ BENNETT

15

16  Subscribed and sworn to before me

17

18  this  13  day of  July  2008.

19
                                JACK STETCH
20                              NOTARY PUBLIC, STATE OF
                                NO. 02ST3841815
21  _____   QUALIFIED IN KINGS COUNTY
                                COMMISSION EXPIRES SEPT. 30, 2009
22      NOTARY PUBLIC

23

24

25

BENNETT

21

1            C E R T I F I C A T E

2

3    STATE OF NEW YORK      )
                                  : SS.:
4    COUNTY OF KINGS        )

5

6

7            I, KATE FRANCOMACARO, a Notary Public for and within

8    the State of New York, do hereby certify:

9            That the witness whose examination is hereinbefore set

10   forth was duly sworn and that such examination is a true record

11   of the testimony given by that witness.

12           I further certify that I am not related to any of the

13   parties to this action by blood or by marriage and that I am in

14   no way interested in the outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto set my hand this

16   27th day of June, 2008.

17

18

19                              *Kate Francomacaro*
                                KATE FRANCOMACARO
20

21

22

23

24

25

## Diamond Reporting, Inc.
## ERRATA SHEET

**Plaintiff(s):** Tom Ognibene, et. al.

**Defendant(s):** Schwartz, et. al.

| Page | Line No. | Error | Correction |
|---|---|---|---|
| 11 | 12 | Debrazzio | De Blasio |
| 14 | 12 & 15 | Debrazzio | De Blasio |
| 15 | 17 | Debrazzio | De Blasio |
| 16 | 23 | Debrazzio | De Blasio |
| 17 | 4, 7, 15, 9 | Debrazzio | De Blasio |

JACK STETON
NOTARY PUBLIC, STATE OF
NO. 02ST3841815
QUALIFIED IN KINGS COUNTY
COMMISSION EXPIRES SEPT. 30, 20__

**DATE:**

**NAME OF WITNESS:** Yvette Velazquez Bennett

**SIGNATURE:** Yvette V. Bennett

Subscribed and sworn to before me this 23 day of July, 2008.

NOTARY PUBLIC