```
ORIGINAL                                                        1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------------X
     TOM OGNIBENE, et al.,
3
4                                    PLAINTIFFS,

5          -against-                 Case No.
                                     08cv013335
6                                    (LTS)(TDK)

7    SCHWARTZ, et al.,

8                                    DEFENDANTS.
     ------------------------------------------X
9
10                          DATE:  June 20, 2008
11                          TIME:  9:22 A.M.
12
13
14          EXAMINATION BEFORE TRIAL of the Plaintiff,
15   SENATOR MARTIN MALAVE DILAN, taken by the Defendants,
16   pursuant to a Court Order, held at the office of Special
17   Federal Litigation, New York City Law Department, 100 Church
18   Street, New York, New York 10007-2601, before a Notary
19   Public of the State of New York.
20
21
22
23
24
25

         DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com
                                     1
```

```
 1     A P P E A R A N C E S:

 2

 3

 4     BOPP, COLESON & BOSTROM, ESQS.
            Attorneys for the Plaintiffs
 5          The National Building
            1 South Sixth Street
 6          Terre Haute, Indiana 47807-3510
            BY:  JOSEPH LA RUE, ESQ.
 7


 8
       MICHAEL A. CARDOZO, ESQ.
 9     CORPORATION COUNSEL
       NEW YORK CITY LAW DEPARTMENT
10          Attorney for the Defendants
            100 Church Street
11          New York, New York 10007-2601
            BY:  JESSE I. LEVINE, ESQ.
12               Special Assistant Corporation Counsel
            FILE #:  2008004838
13          CONTROL #:  III0228

14

15

16

17              *          *          *

18

19

20

21

22

23

24

25
```

1  M A R T I N   M A L A V E   D I L A N, called as a witness,
2  having been first duly sworn by a Notary Public of the State
3  of New York, was examined and testified as follows:
4  EXAMINATION BY
5  MR. LEVINE:
6      Q.    Please state your name and business address for
7  the record.
8      A.    Senator Martin Malave Dilan, 786 Knickerbocker
9  Avenue, Brooklyn, New York 11207.
10     Q.    Good morning, Senator Dilan.
11     A.    Good morning.
12     Q.    My name is Jesse Levine.  I'm an Assistant
13 Corporation Counsel, and I'm here to ask you some questions
14 with respect to the action you brought challenging the
15 City's local law dealing with campaign finances.
16     A.    Right.
17     Q.    We're going to try to keep this short.  I'm
18 going to ask you questions only dealing with issues standing
19 and relating to the Motion for Preliminary Injunction that
20 you've made, your attorneys have made.  And you may be
21 deposed again down the road, but I'm not going to go into
22 much more than what we just talked about.  All right?
23     A.    Okay.
24     Q.    Have you ever been deposed before?
25     A.    I don't recall.  I don't think so.

DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com

1   and even, let's say, if I would file a report, and we would
2   have 75 matchable contributions from the district, if you
3   forgot to put in a zip code, if you forgot to put in a phone
4   number or if they didn't put the title for occupation, the
5   Campaign Finance Board won't validate those.
6              We would have to go back and make corrections
7   or get more contributions, so it's very difficult to raise
8   money within a district like that.
9       Q.   So did you get any business contributions from
10  within the district?
11      A.   I would, yes, get from local businessmen, I
12  would get contributions.
13      Q.   Getting back to the litigation for a second.  Do
14  you receive support from the Rent Stabilization Association
15  in your campaigns?
16      A.   Yes, I have.
17      Q.   Did your relationship with the Rent
18  Stabilization Association play any role in your involvement
19  in this lawsuit?
20      A.   No.
21      Q.   Do you know who directs the strategy in this
22  lawsuit?
23      A.   No, I don't.
24      Q.   Do you control decision-making?
25      A.   No.

1    figure, but I know that we used a firm, you know, we would
2    have someone who would print the letter to -- we would give
3    them the contact, they would print it and it would be sent
4    to a mail house.  It's expensive, that's all I remember.
5    It's expensive proposition, mailings.  That's where the bulk
6    of expenditures would go.
7         Q.    I assume, since you got over 80 percent of the
8    vote, you had a broad-base of support in your community?
9         A.    I would say that, yes.
10        Q.    And did you have support from businesses?
11        A.    For the City Council race?
12        Q.    Yes.
13        A.    I would say I had support from local individuals
14   because, in the campaign finance, we were precluded from
15   accepting money from corporations.  And if their proprietors
16   gave us a contribution, it would be a personal contribution.
17        Q.    What about from unions, did you ever get any
18   union support?
19        A.    From union PACs, yes.
20        Q.    Can you tell me, per election cycle, which ones
21   you got?
22        A.    I can't tell you per election cycle, but I could
23   tell you who, generally, I would expect would contribute.
24   It would be DC37, 32BJ, the hotel workers, UFT, CSA, 1199,
25   to name a few.

SENATOR DILAN
                                                              22

1    Q.   To name a few. What about the uniform --
2    A.   Firefighters, yes.
3    Q.   Police?
4    A.   I don't know if I got, I may have gotten a
5    contribution from them.
6    Q.   Did you ever get one from the Police
7    Lieutenants' Association?
8    A.   It sounds familiar, yeah.
9    Q.   Okay.
10   A.   I can't recall all of them, but I know we got
11   pretty good support from union PACs.
12   Q.   In preparing for this deposition, did you review
13   any documents?
14   A.   No.
15   Q.   Have you, in preparation for this deposition,
16   reviewed the Public Disclosure Statements kept on file by
17   the Campaign Finance Board?
18   A.   No.
19   Q.   Have you ever reviewed those documents?
20   A.   Maybe years ago, when I was in the City Council,
21   perhaps I have.
22   Q.   So what I'm going to do is, in order to make
23   this relatively simple, I'm going to show you, for the
24   various cycles, ask you to take a look and indicate whether
25   you can tell from this certain of the contributors fit the

DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com

1    A.    Right.

2    Q.    To your knowledge, would his contribution be
3    prohibited under the new Campaign Finance Law, $100?

4    A.    If he's contributing, I believe my understanding
5    is that if he's contributing as an individual, I don't think
6    it would be precluded. Whether it would be matchable or not
7    because he's a City Marshal, I don't know the answer to that
8    either.

9    Q.    Have you solicited campaign contributions for
10    potential City Council running in the 2009 cycle?

11    A.    I have not decided, you know, fully that I'm
12    going to do it. I'm contemplating it. I have not filed any
13    papers with the Campaign Finance Board, so I have not
14    solicited any funds.

15    Q.    Have you identified any businesses or lobbyists
16    that you would target for solicitation?

17    A.    You're saying, have I formulated a list?

18    Q.    Yes.

19    A.    Not for that purpose, no.

20    Q.    Do you know of any potential contributors who
21    would be affected by the Campaign Finance Law, in the 2009
22    cycle?

23    A.    The only thing I would say is that I know
24    currently, with my current position, I may have a fundraiser
25    and people who will be situated in that situation have

1    A.    With City agencies, yes.

2    Q.    Okay.

3    A.    Yeah.

4    Q.    And were those dealings affected by the amount
5 of the contribution that your constituent gave you?

6    A.    No.

7    Q.    Did it matter to you whether a constituent
8 contributed or not?

9    A.    No.

10    Q.    Do you think that campaign contributions who
11 have business dealings with the City influence the actions
12 of elected officials?

13    A.    I don't think that they do, but at least, you
14 know, they have not with me.

15    Q.    Have you ever heard rumors of certain other City
16 Councilmen being affected by the contributions of people who
17 do business with the City?

18    A.    I have not had no conversations with anyone
19 regarding that, no.

20    Q.    Do you know whether there's a public perception
21 that it's a bad thing for --

22    A.    Well, I mean, I hear what advocate, you know,
23 advocate groups may say, you know, I hear the Women League
24 of Voters talk about it, I hear the media, the editorials,
25 the press. From that respect, you know, I hear it all the

SENATOR DILAN                                           34

1    time.

2        Q.    Do incumbents have an advantage in obtaining

3    contributions from people who do business with the City?

4        A.    I would assume so.  I hear the same thing in the

5    media.  I think incumbents have a slight advantage.

6        Q.    When you were a councilman, did anybody who

7    contributed to your campaign ask you for your help in

8    getting business with the City?

9        A.    No.

10             MR. LEVINE:  Just give me one minute.

11             Off the record.

12             MR. LA RUE:  Sure.

13             (Whereupon, an off-the-record discussion

14             was held.)

15       Q.    I'm going to ask you a couple of more questions

16   based on the declaration that you previously signed.  Do you

17   want to take a moment to take a look at this?

18       A.    Okay.

19       Q.    Paragraph 5 says --

20             MR. LA RUE:  Excuse me, is this being

21             entered into evidence or -- and I'm not

22             telling you to, I just don't want to note

23             it, if it's not.

24             MR. LEVINE:  I'm going to have this

25             deemed marked as "J", I'll get a couple of

DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com

1	getting the democratic line in the general election is

2	tantamount to election.

3	        Q.    And if you ran for City Council next year, would

4	you expect that the democrat would get the same percentage?

5	        A.    Well, first you have to get past the primary.

6	        Q.    Right.

7	        A.    And if you win the primary, I would expect that,

8	in that council district, that the same rule would apply.

9	        Q.    Do you know of any potential primary opponents?

10	        A.    I know that there have been people indicating

11	that they plan to run, there have been people who, you know,

12	as a leader of the district, who have even called me to say

13	they want to sit down to talk about running for City

14	Council, I heard names of other individuals who are

15	considering to run, so I expect that there would be a

16	primary.

17	        Q.    And again, have you made up your mind whether or

18	not you're going to run?

19	        A.    I'm going to be making that decision later this

20	year.

21	        Q.    Have you formed any committee to raise funds for

22	that potential race?

23	        A.    Not at this time.

24	        Q.    I'd like you to read paragraph 7. Read that into

25	the record, please.

1   MR. LA RUE: What he means is, read it
2   out loud so that she could type it.
3   MR. LEVINE: Sorry, I forgot.
4   MR. LA RUE: That's fine.
5   A.   "Because candidates are currently raising funds
6   for the 2009 election, it is imperative that the court grant
7   relief immediately. Every day that passes without judicial
8   relief is another day that my First Amendment and Fourteen
9   Amendment rights are impermissibly burdened."
10  Q.   Am I correct that your previous answer is that
11  you have not yet decided whether to run and you have not yet
12  begun fundraising?
13  A.   That's correct.
14          (Continued on next page to include
15          jurat.)
16
17
18
19
20
21
22
23
24
25

SENATOR DILAN 41

1    MR. LEVINE:  I have no further questions.

2 Thank you for your time, sir.

3    (Whereupon, the aforementioned document

4 was marked as Defendants' Exhibit J for

5 identification as of this date by the

6 reporter.)

7    (Whereupon, at 10:26 a.m., the

8 examination of this witness was concluded.)

9

10 _____
    SENATOR MARTIN MALAVE DILAN

11

12

13 Subscribed and sworn to before me

14 this __21__ day of __JULY__, 2008.

15

16 _____
    NOTARY PUBLIC

17
    VICTOR W. VILLAMAR
    Notary Public, State of New York
18    No. 24-5001778
    Qualified in Kings County
    Commission Expires Sept. 14, 2010

19

20

21

22

23

24

25

DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com

41

SENATOR DILAN

43

1

2           C E R T I F I C A T E

3

4   STATE OF NEW YORK    )
                         : SS.:
5   COUNTY OF NASSAU     )

6

7

8

9           I, JoANN VANCOSKY, a Notary Public for and

10  within the State of New York, do hereby certify:

11          That the witness whose examination is

12  hereinbefore set forth was duly sworn and that such

13  examination is a true record of the testimony given by that

14  witness.

15          I further certify that I am not related to any

16  of the parties to this action by blood or by marriage and

17  that I am in no way interested in the outcome of this

18  matter.

19          IN WITNESS WHEREOF, I have hereunto set my hand

20  this 23rd day of June, 2008.

21

22

23                              _____
                                        JoANN VANCOSKY
24

25

DIAMOND REPORTING (718) 624-7200 info@diamondreporting.com