# ORIGINAL

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------X
    TOM OGNIBENE, et al.,
3
                                    PLAINTIFFS,
4

5                   -against-      Case No:
                                   08 CV 01335(LTS)(TDK)
6

7   SCHWARZ, et al.,

8                                   DEFENDANTS.
    ------------------------------------------------X
9

10                          DATE:  June 17, 2008

11                          TIME:  12:41 P.M.

12

13

14                  EXAMINATION BEFORE TRIAL of the Plaintiff,

15  THOMAS V. OGNIBENE s/h/a TOM OGNIBENE, taken by the

16  Defendant(s), pursuant to Stipulation and to the Federal

17  Rules of Civil Procedure, held at the offices of Michael A.

18  Cardozo, Esq., New York City Law Department, 100 Church

19  Street, New York, New York 10007, before Cleo Shenkin, a

20  Notary Public of the State of New York.

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3    BOPP, COLESON & BOSTROM, ESQS.
              Lead Counsel for Plaintiff(s)
 4            TOM OGNIBENE, et al.
              The National Building
 5            1 South Sixth Street
              Terre Haute, Indiana 47807-3510
 6            BY:  JOE LA RUE, ESQ.

 7

 8
      MICHAEL A. CARDOZO, ESQ.
 9    CORPORATION COUNSEL
      NEW YORK CITY LAW DEPARTMENT
10            Attorney for Defendant(s)
              SCHWARZ, et al.
11            100 Church Street
              New York, New York 10007
12            BY:  LISA GRUMET, ESQ.
                  SENIOR COUNSEL
13            File #:  2008004838
              Control #:  III02244
14

15

16    ALSO PRESENT:
              ASHLEY COMPTON
17

18                    *          *          *

19

20

21

22

23

24

25
```

1    T H O M A S   V.   O G N I B E N E, called as a witness,

2    having been first duly sworn by a Notary Public of the

3    State of New York, was examined and testified as follows:

4    EXAMINATION BY

5    MS. GRUMET:

6         Q.    Please state your name for the record.

7         A.    Thomas V. Ognibene.

8         Q.    Where do you reside?

9         A.    64-82 83rd Street, Middle Village, New York

10   11379.

11              MS. GRUMET:  To start, just for record, I

12              wanted to make clear that this deposition is

13              addressed to the claims raised in the plaintiff's

14              preliminary injunction motion and is deemed

15              continuing for the purposes of the remainder of

16              the litigation.

17              And I also just wanted to make clear that

18              for the purposes of the deposition, if I'm asking

19              you questions about what you did in connection

20              with your runs for elective office, that I will

21              be referring to yourself and to anyone acting on

22              your behalf.

23              THE WITNESS:  Okay.

24        Q.    Have you ever taken a deposition before?

25        A.    Yes.

OGNIBENE

1    on the Conservative party line, in 2005, was not elected.

2                And then I ran again just recently in the special

3    election in the 30th Council District, in 2008, and was not

4    elected.

5        Q.    And what are your claims in this litigation?

6        A.    My claims in this litigation is that, although

7    I've been an experienced candidate and run with campaign

8    finance, under the newer laws that were passed by the City

9    Council, after I left, that they've become more restrictive

10   in terms of the opportunity for raising money and also for

11   raising money that will eventually become matched by

12   campaign finance.

13               Specifically the laws that I think make it

14   difficult for me as a candidate are the ones that limit the

15   opportunity to obtain campaign contribution from LLCs or

16   LLPs, uh, and also limiting contributions from persons who

17   either do business with the City or are part of a firm that

18   does business with the City to $250, and then also the fact

19   that those contributions are not matchable, seriously

20   impair my ability to raise funds to run for public office.

21       Q.    How did you become involved with the litigation?

22       A.    I was interested in running for public office and

23   at the time that I was contacting people who had been

24   supportive of me and they advised me, particularly people

25   with the Rent Stabilization Association, that it was very

OGNIBENE

1   difficult for them to support me, and they went through

2   the -- you know, a litany of explanations as to why they

3   would have more difficulty, explaining it to me.  I advised

4   them that I thought that that was outrageous and they said

5   that they were considering litigation at that time and

6   would I be interested in becoming a participant in that

7   litigation and I said certainly.

8       Q.     What was the Rent Stabilization Association's

9   position, as expressed to you, concerning the impact that

10  the changes in the campaign finance law would have on their

11  ability to help your campaign?

12      A.     Well, they said it would seriously impair their

13  ability to contribute, or at least assist with the matching

14  funds, because of the stricter new rules.

15      Q.     How so?

16      A.     Well, obviously many of the people that own

17  buildings do business under LLPs and LLCs, and so they

18  could not write, uh, checks from those organizations.

19            Uh, also, there was a limitation on the amount of

20  money that the packs could give.

21            And also, there were people that were part of

22  that that do business with the City of New York and they

23  wouldn't be eligible to give me funds that were matched.

24      Q.     So, does the Rent Stabilization Association

25  ordinarily collect contributions from its members?

OGNIBENE

1     A.     What they do is, they have a candidate come in

2     and meet with their board of directors and talk to them

3     about the issues of concern to the organization and they

4     decide whether or not they are going to either otherwise

5     support or endorse a candidate.  If they do, they encourage

6     their members to support the candidate financially.

7     Q.     Do they actually bundle the contributions from

8     their members?

9     A.     Yes, on occasions they act as intermediaries.

10    Q.     And could you explain what intermediaries means?

11    A.     An intermediary is a person who will collect

12    checks from various people and then deliver them to you and

13    you have to identify that person with Campaign Finance.

14           In other words, if the person sent a check to you

15    directly, you wouldn't have to, but if he gives it to a

16    third party, the third party collects them and brings them

17    to you, he's a bundler, or the correct terminology is

18    "intermediary," and then when you file those checks with

19    Campaign Finance, you have to notify them who was the

20    person who brought the checks to you or acted as an

21    intermediary.

22    Q.     Has the Rent Stabilization Association helped you

23    raise funds in the past?

24    A.     Absolutely.  Yes.

25    Q.     Did they help you raise funds for your 2005

OGNIBENE

1    Q.    And do you know how they knew to call you?

2    A.    Well, I had advised the Rent Stabilization

3    Association that I would be a willing participant.

4    Q.    Is the Rent Stabilization Association a plaintiff

5    in this case, to your knowledge?

6    A.    I, I don't think so.  I don't know.

7          I don't think so.  I think it's just individuals

8    who are candidates, it's my understanding.

9    Q.    Do you know why they are not participating

10   directly in this litigation --

11   A.    No.

12   Q.    -- as plaintiffs?

13         What would you like to see happen as a result of

14   this litigation?

15   A.    I think that I would like to see it be a more

16   level playing field when it comes to the ability to raise

17   funds.

18         Certainly exempting unions is very detrimental to

19   Republican Conservative candidates, because 99 percent, in

20   my estimation, of union contributions go to Democratic

21   candidates.

22         Also, the traditional organizations that fund

23   Republican candidates I think have been seriously impacted

24   by the new rules.

25         The only thing that I would like to see is a

OGNIBENE

1    level playing.

2         Q.     Would you be challenging the law if it covered

3    unions?

4         A.     Say that --

5         Q.     Would you be challenging the law if it covered

6    unions.

7         A.     I still think the limits are unfair.

8         Q.     And why is that?

9         A.     I can give you an example.

10               I had a person that I've known for twenty years

11   who gave me a fifty dollar check and I was notified by

12   Campaign Finance that she worked for the Henry Street

13   Settlement that does business for the City and they

14   disallowed the matching funds on it.

15        Q.     And other than the concerns you raised about

16   unions, how do you feel that the current campaign finance

17   law is unfair to Republicans?

18        A.     Because I think that, first of all, it did not --

19               People should be allowed to support candidates

20   that support their views and I think that, one, limiting

21   the contributions from people who do business with the City

22   to $250 and not matching it really does not have a sound

23   constitutional basis and it is unfair.

24               And someone like myself, who is an attorney, and

25   many attorneys would have loved to have supported me, they

OGNIBENE

1  would be much more comfortable writing a check from their

2  attorneys' account and most of them are LLPs, so that hurt

3  me a great deal.  They don't like to -- they feel more

4  comfortable doing it that way than with personal funds.

5       Many of the real estate owners, I've been very

6  supportive of their issues, they all own buildings as LLCs,

7  and they can't write check from the business account.

8       I don't see why there is any reason for that.

9  There is no rationale, from my point of view.  So, you are

10 limiting my access to a whole group of people who were

11 supportive of my candidacy.

12      Q.    Do you believe that the partnership restrictions

13 disproportionally favor Democrats?

14      A.    I, I --

15            That, I don't know.

16      Q.    How about the LLC restrictions?

17      A.    I couldn't give you an answer.

18            The only thing I could tell you is that it

19 limited my access.

20      Q.    How about the LLP restrictions?

21      A.    Same answer.

22      Q.    And how about the doing business restrictions?

23      A.    Probably it affects --

24            That, that would probably be an equal effect.  I

25 don't know if there's any vantages with doing business, as

OGNIBENE

1   percent, are supportive of Democratic candidates and not

2   supportive of Republican candidates.

3        Q.    Do you intend to run in the 2009 election?

4        A.    Yes, I do.

5        Q.    And for what office?

6        A.    City Council for the 30th Council District.

7        Q.    Do you intend to participate in public financing?

8        A.    I will, I will --

9              I'll be able to answer that more clearly after

10   this litigation is settled.

11       Q.    And what do you mean by that?

12       A.    That if this litigation is won, I likely won't;

13   if my litigation is lost, I would have to rethink.

14       Q.    And why do you say that?

15       A.    Well, because if the -- if my case is sustained,

16   it will open up access for financing from organizations

17   that are otherwise prevented or prohibited from

18   contributing to me under the current law.

19       Q.    Did you participate in public financing in the

20   special election?

21       A.    Yes, I did.

22       Q.    And why was that?

23       A.    We had a very short time frame and the ability to

24   go out and raise funds and plan fund-raisers and do the

25   kinds of things that are necessarily, there simply wasn't

OGNIBENE

1      A.     Well, one of the things that I was able to do was

2   go back to a list of people that had previously supported

3   me, contacted, called, met with people.  Uh, then you go

4   and you get your lists of people and you do, you do

5   mailings and you then phone them.

6           There's two types of list.  There's a small donor

7   list of people that you feel you can get up to fifty

8   dollars and you have some small fund-raisers for them and

9   then you have the major people, in which you go and sit

10   down with and talk to them about -- on a more direct and

11   personal level about raising funds.

12      Q.     Are there any differences in how you conduct a

13   campaign for Council or for mayor?

14      A.     Actually, it's, it's --

15           The only thing that changes is the response.

16      Q.     What do you mean?

17      A.     Running for Council, many, many people are very

18   supportive, because they think you have an opportunity to

19   win and they feel comfortable with your run.

20           For mayor, it was a little more different.

21   People were much more reluctant to donate money.  Not

22   because they didn't think that you were a decent,

23   hardworking person, they just didn't think that it was

24   viable, and people generally like to pick winners.

25      Q.     Okay.

OGNIBENE

1   legal field.

2       Q.      And are there persons who have business dealings

3   with the City who you expect to receive increased

4   contributions from, but for the limits?

5       A.      I definitely think that there are people out

6   there, lobbyist organizations that have interests in

7   litigation before the City Council, issues that are raised

8   in the City budget, that, you know, as a matter of policy,

9   make contributions to candidates that are supportive of

10  their position.

11      Q.      Have you ever received significant support from

12  lobbyists in past elections?

13      A.      I would say yes.

14      Q.      In your 2005 mayoral campaign, what portion of

15  your contributions came from lobbyists?

16      A.      Probably very little.

17      Q.      In your 1997 Council race, what portion of your

18  campaign contributions came from --

19      A.      Honestly, I can't recall.

20      Q.      -- lobbyist?

21              And for your earlier Council races?

22      A.      I really don't...

23      Q.      For your 2005 mayoral campaign, what portion of

24  your contributions came from persons who have business

25  dealings with the City, other than lobbyists?

OGNIBENE

1    A.    I don't think that anybody in their right mind
2  who was doing business with the City contributed to my
3  campaign.
4    Q.    Why do you say that?
5    A.    I honestly don't think that anybody wants to have
6  a problem with Michael Bloomberg.
7    Q.    Do you think that people who had business
8  dealings with the City might have been concerned that they
9  would lose their business if they supported your campaign?
10   A.    Well, I don't know if I would go that fair.
11         I think people didn't see me as particularly
12  viable, once I didn't get the Republican party line.  So,
13  everybody waited to see if I was going to be viable, and
14  once you lose that viability, there's just no interest in
15  supporting your campaign.
16   Q.    And why is that?
17   A.    I guess the same reason that some horses run at
18  ninety-nine to one and some go off at even.  People, you
19  know, feel much more comfortable supporting a winner and if
20  a person doesn't have an opportunity to win, there's less
21  of an interest in supporting them.
22   Q.    Why would someone who has business dealings with
23  the City want to support a winner?
24   A.    Well, I think that everybody -- you know, in our
25  society, everybody has an interest in having people in

OGNIBENE

1   office and in government who have views that are similar to

2   theirs or supportive of their ideas too.  That's the whole

3   American way.  That's why social service agencies support

4   Democratic candidates, that's why unions support Democratic

5   candidates.  And I suppose that that's why people that have

6   interest that coincide with my views would support me.

7       Q.     In your 1997 Council race, what portion of your

8   contributions were from persons with business dealings with

9   the City, other than lobbyists?

10      A.     I can't recall that.

11      Q.     In your 1997 Council race, what portion of your

12  contributions came from LLPs, LLCs or partnerships?

13      A.     I really can't recall.

14      Q.     Have you ever received support from unions?

15      A.     I received support in the current campaign from a

16  union member.  His union didn't endorse me, but the union

17  member himself was supportive of me.  So, the union itself

18  didn't support me.

19             So, I would have to say no, it was an individual

20  who supported me.

21      Q.     Have any unions ever supported you?

22      A.     You know, I don't think so.

23      Q.     Did the Sergeants Benevolent Association help

24  you --

25      A.     I'm sorry, yes.  Absolutely.  I apologize.  Yes,

29

OGNIBENE

1     the Sergeants Benevolent Association supported me.

2          Q.     And what kind of support did they provide?

3          A.     They called their members, uh, I think they -- I

4     think I received financial support from them also.

5          Q.     And when did they provide that support?

6          A.     Right after their contract negotiations with the

7     City stalled.

8          Q.     And for which campaign?

9          A.     2005 mayoral.

10         Q.     Did they support you for any other campaign?

11         A.     No.

12                You know what, let me go back.  Because I'm not

13     thinking.

14                The police unions have supported me over the

15     years, the PBA, firefighters and people like that.

16         Q.     And for which campaigns?

17         A.     Uh, I would think all, except the 2005 mayoral.

18     I think in all of my Council campaigns.  Most of the

19     uniformed services were supportive of my candidacy.

20         Q.     And which uniformed service supported your

21     campaign?

22         A.     PBA, uniformed fire officers, firefighters.

23                You know, uh, it's hard for me to remember.

24                I would say universally the uniformed forces were

25     supportive.

OGNIBENE

1    they feel a much closer infinity to Democratic candidates

2    than they do to Republican candidates.

3       Q.     Are there some unions that more commonly support

4    Republicans?

5       A.     Yeah.

6              And I think it's law enforcement and uniformed

7    services are much more willing to cross that line.

8       Q.     Are there any other unions that you are aware of

9    that more commonly support Republican candidates?

10      A.     No.

11             MS. GRUMET:  Do you want to take a

12             five-minute break?

13             MR. LA RUE:  Yeah, that would be fine.

14             (Whereupon, a short recess was taken.)

15             (Whereupon, Ms. Compton left the deposition

16             room and did not return.)

17      Q.     In your view, do campaign contributions by

18   persons who have business dealings with the City ever

19   influence the actions of elected officials?

20      A.     They didn't influence mine.

21             As for other elected officials, I can't answer.

22      Q.     In your view, is there a public perception that

23   campaign contributions by persons that have business

24   dealings with the City may influence the actions of elected

25   officials?

OGNIBENE

1    A.    Yes.

2    Q.    And what is the basis for your answer?

3    A.    Just, uh, you know, standing at a train station,

4    talking to people and campaigning, as they come walking,

5    the ones that usually throw it back in your face make a

6    comment.

7    Q.    And what do they say?

8    A.    You know, "You're all a bunch of crooks."

9          You know, people have a lot of angry things to

10   say.  So, my understanding is, just reading the papers,

11   with the slush fund issues and that, you get a general

12   sense that people think that people with money have a

13   greater influence than they do.

14   Q.    And what do you mean by the "slush fund issues"?

15   A.    Well, that was a City Council issue in which they

16   used nonexistent not-for-profits to park money, to be used

17   later.

18         The City Council did that.  Specifically, the

19   speaker.

20   Q.    In your view, do people who do business with the

21   City favor incumbent officials when making contributions?

22   A.    I would say that it's true of all people who

23   contribute.

24   Q.    And why do you say that?

25   A.    Again, I think people feel comfortable with

OGNIBENE

1    winners and they are reluctant to back people, uh, you

2    know, that, that they don't think can win.

3          And, you know, I experienced that in 2005, when

4    many people said, "we love you Mr. Ognibene, but can you

5    beet Mr. Bloomberg," and the answer was probably not.

6          But that was their rationale.  When my rationale

7    is if you vote for the person that you believe in, then,

8    you know, you are not a looser.

9          Unfortunately, people feel more comfortable with

10   winners.  Or potential winners.

11   Q.     In your view, do campaign contributions by

12   lobbyists ever influence the campaigns of elected

13   officials?

14   A.     Influence?  No.

15          Maybe allow maybe, maybe some more access.

16          Maybe.  But not influence.

17   Q.     And what do you mean by more access?

18   A.     Well, you can't answer every phone call that

19   comes into your office, but generally if it's somebody

20   that's, you know, a lobbyist, generally if they call you

21   about a specific major issue, that's -- they are probably

22   more tuned into what's going on in government, and so you

23   take their call.  But you can't take every call that comes

24   into your office.

25   Q.     So then, in your view, do contributions by

OGNIBENE

1   lobbyists help lobbyists get access to elected officials?

2       A.      You know, I'm not sure, I'm not sure.

3               And, you know, yeah, there's access.  But I think

4       it's because you think that they have a targeted issue, you

5       know, rather than some generalized conversation.

6               People call you sometimes to talk about things

7       that you can't change or have any influence over.

8       Generally, when a lobbyist calls, it's about something

9       specific that's before the City Council or legislation, so

10      it's a call, at least it's something that you can deal with

11      with a yes or no answer.

12              Whereas, you can't take every call from everyone,

13      because they may be talking about things on a national

14      level, that you can't deal with.

15      Q.      What is your view of the contribution limit

16      restrictions on lobbyist from the recent changes to the

17      campaign finance law?

18      A.      You know I, I'm kind of -- I'm not really --

19              I understand there have to be some restrictions.

20      You know, I don't have a problem with having limits on, on

21      the total amount.

22              But you are talking about lobby -- lobbyists per

23      se, rather than particular organizations that are not --

24      Q.      Yes, lobbyists.

25              MR. LA RUE:  Can we go off the record for

OGNIBENE

1          just a moment.

2               (Whereupon, a short recess was taken.)

3     A.    So, it's different from the lobbyists, as opposed

4     to the people who are actually doing business with the

5     City, even though -- that's what I'm more opposed to.

6          Lobbyist, if you want to limit what a particular

7     lobbying organization itself can contribute, I understand

8     that.

9     Q.    So, in this litigation, are you personally

10    challenging the lower contribution limits that apply to

11    lobbyists?

12    A.    Not necessarily, no.

13              MR. LA RUE:  Can we go off the record for

14          just a minute.

15              MS. GRUMET:  Sure.

16              MR. LA RUE:  Let me meet with him and then

17          you can revisit this question, if you will, and

18          probe all you want to.

19              MS. GRUMET:  Okay, can we just note, for the

20          record, that we are taking a break, at the

21          request of plaintiffs' counsel to speak with his

22          client.

23              MR. LA RUE:  Definitely.

24              (Whereupon, the witness and his attorney

25          left the deposition room and returned shortly

OGNIBENE

1   specifically.

2           The answer is probably yes, there probably were

3   some people who did.  But I can't be specific about it.

4       Q.      Did you solicit contributions from officials from

5   any organizations that you had assisted in your role as a

6   Council member?

7       A.      No.

8       Q.      When you were a Council member, did anyone who

9   had contributed to your campaign ever lobby you to help

10  them or their organizations in some way?

11      A.      Yes.

12      Q.      And who?

13      A.      You know, I'm -- I get lobbied --

14          Probably every Council member gets lobbied every

15  day from any -- so, you get calls for people that you have

16  contributed to.

17          Juniper Park Civic Association wanted to have the

18  park redone and so that's lobbying, when they come in and

19  say we need a new ball field.

20          But I don't think anybody ever lobbied on behalf

21  of themselves, they lobbied on behalf of the organization.

22          So, the answer is certainly, yes.

23      Q.      Were you lobbied by the Rent Stabilization

24  Association?

25      A.      Oh, absolutely.

OGNIBENE

1    a decision for what other people did.  I really couldn't

2    answer that question.

3         Q.    Okay.

4               What was the outcome of the special election?

5         A.    Uh, Anthony Como won by thirty-nine votes over

6    Elizabeth Crowley, and by some almost three hundred votes

7    over me, out of approximately seventy-sive hundred votes.

8               Anthony Como was the Republican organizational

9    candidate and Elizabeth Crowley was the Democratic

10   organizational candidate.  And there was another candidate,

11   Charles Ober, who was an insurgent Democrat.

12              And Elizabeth Crowley was ineligible for public

13   funds, and Mr. Ober was, but I don't think he qualified.

14   And he only received seven hundred and something votes.  He

15   finished a distant fourth.

16        Q.    And do you have any opinion as to the reason for

17   the outcome?

18        A.    Probably the organizational candidates had a

19   greater Election Day operation, in terms of being able to

20   get out the vote, which is phone calls, ringing door bells,

21   driving people to polls, et cetera.

22        Q.    Who is Ronald Lattanzio?

23        A.    Ron Lattanzio was a expeditor, who helped me

24   raise funds.  I think over the period that I knew him I

25   raised close to two hundred thousand, over four years, and

OGNIBENE

1

2    Q.    Have you spoken with any of the other plaintiffs

3  about this litigation?

4    A.    Probably briefly with Fran Reiter.  But just

5  causally, not formally.

6         I think when we signed some documents over at the

7  Manhattan law firm (indicating), she was going in and I was

8  coming out.

9    Q.    And did you speak with anyone from the

10  Conservative party about this litigation?

11    A.    No.

12         I didn't know they were part of it.  I hadn't

13  thought about it.

14         MS. GRUMET:  I have no further questions.

15         (Whereupon, at 2:00 P.M., the Examination of

16         this Witness was concluded.)

17

18

19         _____
                 THOMAS V. OGNIBENE

20

21  Subscribed and sworn to before me

22  this _21_ day of _July_ , 200_8_.

23  _Margaret Ognibene_
              NOTARY PUBLIC

24                                    MARGARET OGNIBENE
                                    COMMISSIONER OF DEEDS
25                                  NEW YORK CITY No. 4-4595
                                  TERM EXPIRES MARCH 1, 19
                                            2009

OGNIBENE

1              C E R T I F I C A T E

2

3    STATE OF NEW YORK        )
                                  :  SS.:
4    COUNTY OF KINGS          )

5

6

7              I, CLEO SHENKIN, a Notary Public for and within

8    the State of New York, do hereby certify:

9              That the witness whose examination is

10   hereinbefore set forth was duly sworn and that such

11   examination is a true record of the testimony given by that

12   witness.

13             I further certify that I am not related to any

14   of the parties to this action by blood or by marriage and

15   that I am in no way interested in the outcome of this

16   matter.

17             IN WITNESS WHEREOF, I have hereunto set my hand

18   this 18th day of June, 2008.

19

20                     *Cleo Shenkin*

21                     ―――――――――――――――――
                            CLEO SHENKIN

22

23

24

25

**Diamond Reporting, Inc.**
## ERRATA SHEET



**Plaintiff(s):** _Ognibene, et al._

**Defendant(s):** _Schwartz, et al._

| Page | Line No. | Error | Correction |
|------|----------|-------|------------|
| 36 | 9-10 | "twenty -sive hundred fifty dollars" | two hundred fifty dollars ($250.00) |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | MARGARET OGNIBENE |
| | | | COMMISSIONER OF DEEDS |
| | | | NEW YORK CITY No. 4-4595 |
| | | | TERM EXPIRES MARCH 1, 19___ 2009 |



**DATE:** July 21, 2008

**NAME OF WITNESS:** Thomas V Ognibene

**SIGNATURE:**

Subscribed and sworn to before me
this _21_ day of _July_, 2008.

_Margaret Ognibene_
NOTARY PUBLIC