UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TOM OGNIBENE, YVETTE VELAZQUEZ BENNET,
VIVIANA VAZQUEZ-HERNANDEZ, ROBERT PEREZ,
FRAN REITER, SHEILA ANDERSEN-RICCI,
MARTINA FRANCA ASSOCIATES, LLC,
REITER/BEGUN ASSOCIATES, LLC,
DENIS GITTENS, OSCAR PEREZ, THE KINGS
COUNTY COMMITTEE OF THE NEW YORK STATE
CONSERVATIVE PARTY, THE NEW YORK STATE
CONSERVATIVE PARTY, MARTIN DILAN, and
MARLENE TAPPER,

        Plaintiffs,

    -v-                                 No.  08 Civ. 1335 (LTS)(TDK)

JOSEPH P. PARKES, S.J, in his official capacity as
Chairman of the New York City Campaign Finance Board,
DALE C. CHRISTENSEN, JR., KATHERYN C. PATTERSON,
and MARK S. PIAZZA, in their official capacity as members of
New York City's Campaign Finance Board, MARK DAVIES,
in his official capacity as Executive Director of the New York City
Conflicts of Interest Board, and MONICA BLUM,
STEVEN ROSENFELD, ANDREW IRVING, and
ANGELA M. FREYRE, in their official capacity as members
of New York City's Board of Conflicts of Interest, and
MICHAEL MCSWEENY, in his official capacity as
Acting City Clerk of New York City,

        Defendants.

-------------------------------------------------------x

**OPINION AND ORDER**

APPEARANCES:

DAVIDOFF, MALITO & HUTCHER, LLP
   By: Charles Capetanakis
605 Third Avenue
34th Floor
New York , NY 10158

BOPP, COLESON & BOSTROM
   By: James Bopp
        Joseph Eugene La Rue
1 South Sixth Street
Terre Haute , IN 47807

*Attorneys for Plaintiffs*

NYC LAW DEPARTMENT, OFFICE OF
THE CORPORATION COUNSEL
   By: Jonathan L. Pines
100 Church Street
New York , NY 10007

*Attorney for Defendants*

PROSKAUER ROSE LLP
   By: John Hoover Snyder
1585 Broadway
New York , NY 10036

*Attorney for Amici Citizens Union, Common
Cause/NY, and New York Public Interest
Research Group*

JENNER & BLOCK LLP
   By: Paul March Smith
1099 New York Avenue, N.W.
Suite 900
Washington , DC 20001-4412

*Attorney for Amici Brad Lander and Mark
Winston Griffith*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs[1] bring this action for declaratory and injunctive relief against Defendants alleging that certain provisions of New York City's political campaign finance and lobby laws violate the First and Fourteenth Amendments to the Constitution of the United States and the Voting Rights Act, 42 U.S.C. § 1973.  Specifically, Plaintiffs allege that certain recently-enacted amendments to the New York City Administrative Code ("Administrative Code"), commonly known as the "pay-to-play" rules, which reduce to levels below the generally-applicable campaign contribution limits the amounts that lobbyists, and persons engaged in certain business dealings with the City of New York, can contribute to political campaigns, ban contributions by certain types of entities, and deny matching contributions in connection with campaign contributions by lobbyists and certain persons associated with them.  Plaintiffs assert that these aspects of the laws unduly burden protected political speech and association in violation of the First Amendment and deny equal protection of the laws in violation of the Fourteenth Amendment, both facially and as applied.  The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a).

Plaintiffs filed an original and an amended complaint in February 2008 and, in April 2008, moved for a preliminary injunction on some, but not all, of the claims asserted in the amended complaint.  In their motion for preliminary injunctive relief, Plaintiffs raised facial constitutional challenges to the Administrative Code provisions that lower contribution limits and disallow matching funds for contributions by individuals who have "business dealings with the

---

[1]     The Plaintiffs in this action include New York City voters, aspiring candidates for local office, a business owner, lobbyists and persons affiliated with lobbyists, limited liability companies, and political parties.  Defendants challenge the standing of one of the Plaintiffs, Robert Perez, to challenge the "doing business" contribution limits that are discussed infra.  Because the lobbyist-plaintiffs clearly have standing to challenge the limitations in question, it is unnecessary for the Court to address standing as to Mr. Perez at this time.

City" and to the Administrative Code provision prohibiting contributions from partnerships, LLCs and LLPs. The Court ordered the hearing on the injunctive relief requested consolidated with the trial of those claims on the merits. Defendants thereafter moved for summary judgment in their favor on those claims and, with the Court's consent, filed a consolidated brief in support of the motion for summary judgment and in opposition to the motion for injunctive relief. Citizens Union, Common Cause/NY and New York Public Interest Group (collectively "Organization Amici"), filed an amicus curiae brief in support of Defendants, and City Council candidates Brad Lander and Mark Winston Griffith (collectively "Candidate Amici") also filed an amicus curiae brief in support of Defendants.

The parties stipulated that there was no need for an evidentiary proceeding in connection with the motions, and the Court heard oral argument on the motions on November 25, 2008. The Court has carefully considered the submissions and arguments of the parties and amici, including the parties' post-oral argument letter submissions. For the reasons explained below, Plaintiffs' motion for injunctive relief is denied and Defendants' motion for summary judgment is granted. This Opinion constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rules of Civil Procedure 52 and 65.

## BACKGROUND

The following material facts are undisputed. New York City's Campaign Finance Act (the "CFA") established the New York City Campaign Finance Program (the "Program") in 1988. (Defs' 56.1 Stmt. at ¶ 6.)[2] The Campaign Finance Board (the "Board") administers the Program and provides public matching funds to candidates running for Mayor, Comptroller, Public

---

[2]     Citations to the parties' Local Rule 56.1 Statements incorporate by reference the evidence cited therein.

Advocate, Borough President and City Council member.  (Id. at ¶ 7.)   The CFA imposes certain obligations on all candidates, including filing financial disclosure statements reporting contributions and expenditures, limitations on the amount of contributions that can be received from any single contributor, and the obligation to respond to the Board's requests for documentation and information to verify compliance with the Program.  (Id. at ¶ 9.)  Additionally, "participating candidates" (those candidates who seek to participate in the public financing system), must agree to limitations on the total amount of money the campaign spends promoting the candidate's nomination or election.  (Id.)  A participating candidate's campaign receives public matching funds for all eligible individual private contributions by New York City residents of up to $175 at a rate of six dollars in public funds for every one dollar in private contributions.  (Id. at ¶ 10.)  However, under Administrative Code sections 3-702(3) and 3-703(1-a), contributions from organizations, including unions and Political Action Committees ("PACs"), and contributions from certain individuals considered to have business dealings with the City, as defined in the law, as well as individuals identified on a lobbyist's statement of registration, are not eligible for matching.  (Id. at ¶ 12.)

In general, the CFA limits per-person contributions for all covered elections in a single calendar year to $4,950 for Mayor, Comptroller or Public Advocate, $3850 for Borough President, and $2,750 for City Council.[3]  (Id. at ¶ 13.)  Under certain circumstances, contributions exceeding these limits by up to half the applicable amount may be made.  (Id.)  Certain individuals

---

[3]     Pursuant to section 3-703(7), the figures were increased in 2002 to reflect changes in the Consumer Price Index.  (Defs' 56.1 Stmt. n. 2.)

who have "business dealings with the City" are subject to lower limitations,[4] and certain types of organizations are not permitted to make any contributions.  (Id. at ¶ 14.)

In 1998, a New York City Charter Revision Commission (the "Commission") made a series of recommendations relating to campaign finance reform, including that corporate contributions "should be banned outright" because they are "inherently problematic."  (Id. at ¶ 17.) The Commission characterized a ban on corporate contributions as "a step toward solving" the problem of "doing business" contributions.  (Id. at ¶ 18.)  The Commission also proposed regulating contributions from those who do business with the City.  (Id.)  The Commission identified concerns relating to contractor and lobbyist contributions, but acknowledged that "[g]enerally there is no evidence that these campaign contributions actually influence the award of a particular contract or passage of a bill."  (Id.; see also Pines Decl., Ex. F, Report of the New York City Charter Revision Commission dated August 20, 1998 ("1998 Commission Report") at p. 19.) Despite the lack of evidence of actual influence, the Commission concluded that there is "no doubt that these contributions have a negative impact on the public because they promote the perception that one must 'pay to play.'"  (Id.)

The Commission proposed, and the City's voters approved through a referendum, a 1998 Charter amendment requiring the Board to prohibit corporate campaign contributions, requiring participating candidates to disclose contributions received from individuals and entities doing business with the City and directing the Board to "promulgate such rules as it deems necessary to regulate the acceptance by candidates participating in the voluntary system of campaign finance reform of campaign contributions by individuals and entities doing business with

---

[4]     These lower limitations are referred to as "doing business" restrictions or limits in this Opinion.

the city, including rules that determine which business dealings shall be covered by such rules."
(Defs' 56.1 Stmt. at ¶¶ 19-20, 14; see also Charter §§ 1052(a)(12)-(13).)  The City Council later
enacted a separate ban on corporate contributions to candidates, including non-participating
candidates.  (Defs' 56.1 Stmt. at ¶ 20.)

   In 2005, New York City's Vendor Information Exchange System ("VENDEX"),
containing information about City vendors, and a database of lobbyists registered with the City
Clerk's office became available online.  (Id. at ¶ 24.)  The Board held several public hearings
during 2005 and 2006 relating to "doing business" contributions, (Id. at ¶ 25), and requested that
research be conducted by a team of students at New York University's Wagner Graduate School of
Public Service based on the VENDEX and lobbying database data.  In its interim report on "doing
business" contributions, dated June 19, 2006, the Board reported based on the students' research that
campaign contributions by individuals and entities "doing business"[5] with the City represented
27.5% of the monies contributed in the 2001 election cycle and 22.3% of those contributed in the
2005 election cycle.  (Id. at ¶¶ 26-27; see also Loprest Decl., Ex. A, Interim Report of the New York
City Campaign Finance Board on "Doing Business" Contributions ("2006 Interim Report").)  The
study also concluded that contributors who gave large amounts of money were more likely to be
"doing business" with the City than were smaller contributors.  (Id.)  In its post-election report on
the 2005 elections, which was published in 2006 (the "2005 Election Report"), the Board made
several recommendations for improving the CFA, including banning all organizational
contributions (including contributions from partnerships, LLCs, PACs and unions), and regulating

---

[5]   The "doing business" definition relied upon in the research differed somewhat from
the "business dealings" definition enacted in the Administrative Code provisions at
issue here.  (Defs' 56.1 Stmt. n. 4.)

contributions by individuals and entities "doing business" with the City.  (Id. at ¶¶ 30-32; Loprest Decl., Ex B., Public Dollars for the Public Good ("2005 Election Report" ).)

In 2006, the City enacted Local Laws 15 and 16, which, inter alia, amended Administrative Code section 3-213 to create a mandatory electronic filing system for "lobbyists," added section 3-216.1 (requiring full lobbyist disclosure of all fundraising and consulting activities), and added section 3-225 (banning all gifts from lobbyists to City officials), and Local Law 17, which amended the Administrative Code section 3-702(3) definition of a "matchable contribution" to exclude contributions from lobbyists and any other persons required to be included in statements of registration required to be filed with the City Clerk pursuant to Administrative Code section 3-213(c)(1).  (Defs' 56.1 Stmt. at ¶¶ 34-36; see also Local Laws 15, 16, and 17 (Pines Decl. Exs. C-E).)  According to section 3-213(c)(1), the spouse or domestic partner of a lobbyist, and, if the lobbyist is an organization, any officer or employee of such lobbyist who engages in any lobbying activity or who is employed in a division of the organization that engages in lobbying activity, and the spouse or domestic partner of such officer or employee, are to be included on the registration statement.  See N.Y.C. Admin. Code § 3-213(c)(1).  Administrative Code section 3-213(b) provides that "[s]uch statements of registration shall be kept in electronic form in the office of the city clerk and shall be available for public inspection."

In 2007, the City Council passed Local Law 34, which requires disclosure of and reduces the contribution limits for individuals who have "business dealings with the City," as defined in the CFA.[6]  (Defs' 56.1 Stmt. at ¶ 38.)  Among other changes, Local Law 34 amended

---

[6]   Additional technical amendments to this legislation were enacted in Local Law 67. (Id. at ¶ 38.)

Administrative Code section 3-703[7] by adding subdivision 1-a, which restricted contributions from those having "business dealings" with the City from the generally-applicable levels to $400 for citywide campaigns, $320 for Borough President, and $250 for City Council, and amending section 3-702(3) to make such contributions ineligible for public matching. (Defs' 56.1 Stmt. at ¶ 39; Local Law 34 (Pines Decl. Ex. A).) Local Law 34 added subdivisions 18 and 20 to section 3-702, which defined "business dealings with the City" and "persons" for the purposes of the "Doing Business Database." Local Law 34 also amended section 3-703(1)(l) to extend the ban on corporate contributions to LLCs, LLPs and partnerships. (Defs' 56.1 Stmt. at ¶ 39; Local Law 34 (Pines Decl. Ex. A).)

The City Council Committee Report (the "Committee Report") relating to these amendments referenced the 2006 Interim Report, and stated that, "[w]hile there is nothing intrinsically wrong with contributions from those doing business with the City, the ability of such individuals to contribute could create a perception, regardless of whether such perception is accurate, that such individuals have a higher level of access to the City's elected officials. It is important to eradicate this perception and reduce the appearance of undue influence associated with contributions from individuals doing business with the City." (Defs' 56.1 Stmt. at ¶ 40; see also Pines Decl., Ex. H, New York City Council, Report of the Governmental Affairs Division, Committee on Governmental Operations, for Int. No. 586-2007, ("Committee Report") at 24-25.) With respect to the expansion of the corporate contribution ban to other types of entities, the Committee Report described the change as addressing "a loophole in the law that permits similarly

---

[7] The section 3-703 amendment applies to contributions for participating candidates. Local Law 34 also amended section 3-719(2) with respect to non-participating candidates.

structured business entities, such as limited liability companies ("LLC"), limited liability partnerships ("LLP") and partnerships" to contribute up to the full contribution limit.  (Defs' 56.1 Stmt. at ¶ 41.)

The so-called "doing business" restrictions apply to a "natural person" who is "a chief executive officer, chief financial officer and/or chief operating officer . . . or . . . serving in an equivalent capacity" or who is "employed in a senior managerial capacity" or has an interest which "exceeds ten percent" of an entity that has "business dealings" with the City or affiliate agency. (Id. at ¶ 44.)  "Business dealings" are defined, in section 3-702(18), to include certain transactions that fall within the following categories: (i) contracts for the procurement of goods, services and construction; (ii) concessions and franchises; (iii) grants; (iv) economic development agreements; (v) contracts for investment of pension funds; (vi) real property acquisitions or dispositions; and (vii) applications for land use approvals or zoning text amendments.  (Defs' 56.1 at ¶ 42.)  There are separate rules concerning "actions, transactions and agreements providing affordable housing." (Id.; see also N.Y.C. Admin. Code § 3-702(18).)

Transactions falling into one of the aforementioned categories are considered "business dealings" when the aggregate value of the transactions between the entity and the City or affiliated agency, over the course of a certain time period, reaches or exceeds a certain specified amount.  For example, a franchisee is considered to have "business dealings" with the City when the estimated annual value of all franchises that the franchisee has been awarded in the past year amount to $100,000 or more.  (Defs' 56.1 Stmt. at ¶ 66.)  Procurement contracts, concessions, franchises and grants valued at $5,000 or less are not considered in calculating "business dealings." (Id. at ¶¶ 52, 66, 71.)  Contracts and concessions awarded through publicly-advertised competitive sealed bidding and emergency contracts are also excluded from the calculation.  (Id. at ¶¶ 49, 66.)

As of June 30, 2008, New York City agencies, excluding affiliated entities, held a combined total of 19,578 open contracts worth approximately $55.4 billion.  (Id. at ¶ 47.)  Entities considered to have business dealings with the City as of June 30, 2008, included a wide range of for-profit and non-profit entities.  (Id. at ¶ 113; Schaffer Decl. ¶¶ 38-39.)  Non-profit entities listed include the 116th Street Block Association, Inc., the Association to Benefit Children, the Brooklyn Botanic Garden Corporation, the Institute for Labor and the Community, the Southeast Bronx Neighborhood Center, Inc., The Legal Aid Society, and other health and social services providers, day care centers, youth programs, educational and cultural institutions, religious organizations, community organizations, advocacy organizations and others.  (Defs' 56.1 Stmt. at ¶ 113.)  Several labor organizations or union-affiliated entities, including municipal labor organizations, have procurement contracts with the City or an affiliated agency that are considered "business dealings" under the law.  (Defs' 56.1 Stmt. at ¶ 114; admitted in Pls' 56.1 at ¶ 114; see also Schaffer Decl. ¶ 40.)  Defendants concede that City procurement rules do not apply to collective bargaining with City unions, or to employer-employee relationships for non-unionized employees.  (Defs' 56.1 Stmt. at ¶ 54.)

The "doing business" limits also apply to individuals who are "lobbyists."  (Id. at ¶ 44.)  The Administrative Code contains two different definitions of lobbyists in section 3-702.  Section 3-702(18) defines "lobbyist" narrowly, by reference to section 3-211's lobbyist definition, which encompasses "every person or organization retained, employed or designated by any client to engage in lobbying."  N.Y.C. Admin. Code §§ 3-702(18); 3-211(a).  Section 3-702(16) defines "lobbyist" more broadly, as including not only those considered lobbyists under the section 3-211(a) definition, but also the lobbyist's spouse, domestic partner and unemancipated childen, as well as, when the lobbyist is an organization, the officers and employees of the organization who

engage in lobbying or work for a division of the organization that engages in lobbying activities, and family members of such officers and employees.  See N.Y.C. Admin. Code § 3-702(16). Defendants contend that the narrower lobbyist definition is currently applied in construing the "doing business" limitations, but admit that the broader definition of lobbyist has been used in the past.  (Defs' 56.1 Stmt. at ¶ 44; Pls' 56.1 Stmt. at ¶ 44; Defs' Dec. 2, 2008, letter; see also Defs' Mot. for. Summary Judgment at n. 4 ("While the CFB initially construed the Doing Business contribution limits as reaching "lobbyists" as defined by § 3–702(16), it has more recently clarified that, for the purpose of those contribution limits, "lobbyist" shall have the narrower scope of § 3-211(a).").)

_____The parties agree that there are certain campaign contributions that are not subject to the lower "doing business" limits, but which nonetheless are still ineligible for matching.  (See e.g., Defs' Dec. 2, 2008, letter.)  Administrative Code section 3-702(3) defines "matchable contribution" and categorizes as ineligible for matching not only those contributions from contributors subject to the "doing business" limitations, N.Y.C. Admin. Code § 3-702(3)(h), but also "contributions from lobbyists or other persons required to be included in a statement of registration filed pursuant to section 3-213(c)(1)."  N.Y.C. Admin. Code § 3-702(3)(g).  Pursuant to this provision, the contributions of some individuals who are affiliated with lobbyists, but who are not, under the narrower "lobbyist" definition, subject to the lower "doing business" limits, are ineligible for matching.

## DISCUSSION

Plaintiffs assert that they are entitled to an injunction prohibiting enforcement of the Administrative Code provisions lowering the contribution limits for those "doing business" with the City (including insofar as those provisions apply to lobbyists), the provisions denying matching

for campaign contributions by "doing business" contributors as well as by relatives and employees

of lobbyists, and the extension of the corporate contributions ban to LLCs, LLPs and partnerships,[8]

contending that the challenged provisions are facially violative of the First and Fourteenth

Amendments to the Constitution of the United States.  The Court has consolidated its consideration

of the request for preliminary injunctive relief with the determination on the merits of the subject

claims.  Defendants cross-move for summary judgment on those aspects of Counts II, III, IV, VII,

VIII and IX of the Amended Complaint on which Plaintiffs are seeking injunctive relief.

## I. Legal Standard

To obtain permanent injunctive relief, the moving party "must demonstrate (1)

actual success on the merits and (2) irreparable harm."  Cartier v. Symbolix, Inc., 454 F. Supp. 2d

175, 186 (S.D.N.Y. 2006).  Summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil

Procedure is to be granted in favor of the moving party when "the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party

moving for summary judgment bears the burden of establishing that no genuine issue of material

fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Evidence must be viewed

in a light most favorable to the non-moving party and all reasonable inferences must be drawn in

favor of the non-moving party.  Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008).

The parties agree that there are no issues of material fact in connection with these

motions.  For the reasons explained below, the Court finds that Defendants are entitled as a matter

of law to summary judgment in their favor on the aspects of the Administrative Code as to which

---

[8]     These claims encompass aspects of Counts II, III, IV, VII, VIII and IX of the
Amended Complaint.

Plaintiffs have asserted facial constitutional challenges.  In light of this conclusion, Plaintiffs'

requests for injunctive relief must be denied, as they have failed to demonstrate that they are

entitled to prevail on the merits of their facial challenges.

## II. The "Doing Business" Contribution Limits

      A.     Level of Scrutiny/Standard

      In a series of campaign finance decisions beginning with Buckley v. Valeo, 424 U.S.

1 (1976), the Supreme Court has recognized a fundamental First Amendment interest in political

speech and distinguished, in evaluating constraints on such speech and related activity, between

constraints on campaign expenditures and constraints on campaign contributions.  The Court has

applied strict scrutiny to restraints on expenditures.  Contribution limits are, however, treated

differently.  Because they constitute only indirect constraints on protected speech and associational

rights,[9] contribution limits are subject to a more lenient standard of review and are upheld if they

are supported by a sufficiently important state interest and closely drawn to comport with that

interest.  See, e.g., Davis v. Federal Election Comm'n, 128 S. Ct. 2759, 2770 (2008) (recognizing

that the test for contribution limits is whether "they are closely drawn to serve a sufficiently

important interest") (internal quotations omitted).

      Concerns regarding the prevention of corruption and the prevention of public

---

    [9]     See Buckley, 424 U.S. at 20-21 (characterizing campaign contribution limits as "only
a marginal restriction upon the contributor's ability to engage in free
communication"); id. at 21(observing that limiting the amount that an individual can
contribute "involves little direct restraint on his political communication for it
permits the symbolic expression of support evidenced by a contribution but does not
in any way infringe the contributor's freedom to discuss candidates and issues.");
see also Federal Election Commission v. Colorado Republican, 533 U.S. 431, 440
(2001) ("Restraints on expenditures generally curb more expressive and
associational activity than limits on contributions do.").

perceptions of corruption, which undermine public confidence in the integrity of government, have been recognized repeatedly as sufficiently important to support closely drawn restrictions. Corruption and corruption-appearance related justifications for restraints that only incidentally affect speech by cabining contributors' efforts to provide candidates with money with which to speak require little scrutiny, as "it [is] difficult to isolate suspect contributions," Buckley, 424 U.S. at 30, and without legislative authority to impose measures designed to protect against the appearance of corruption, "the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 382, 390 (2000).

The Supreme Court has recognized, however, that contribution restrictions can be so draconian as to constrain candidates' ability to amass sufficient funds to speak effectively. In such situations, the unusually draconian restraints, or factors combining to effect such restraints, must be supported by a showing of special justifications in addition to meeting the requirement that they be closely drawn. Randall v. Sorrell, 548 U.S. 230, 261 (2006). The question of whether contribution limits impose such restraints on candidates' ability to amass sufficient resources is a fact-intensive one, and neither party has raised it in connection with the motion practice now before the Court.

The Court thus evaluates Plaintiffs' facial challenges to the New York City restrictions in light of the Supreme Court's general campaign contribution jurisprudence.

      B.      Have Defendants Demonstrated that the Limits
                     Serve a Sufficiently Important Governmental Interest?

The Supreme Court has consistently recognized the interest in preventing actual or apparent corruption as a sufficiently important governmental interest justifying limits on contributions. See, e.g., McConnell v. Federal Election Commission, 540 U.S. 93, 143 (2003)

("Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits.").  In upholding the contribution limits in <u>Buckley</u>, the Court recognized that "the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" was a concern almost equal in significance to that of the danger to public integrity posed by actual <u>quid</u> <u>pro</u> <u>quo</u> contribution-influence arrangements. <u>Buckley</u>, 424 U.S. at 27; <u>see</u> <u>also</u> <u>Federal Election Commission v. Colorado Republican</u>, 533 U.S. 431, 440-41 (2001) ("limits on contributions are more clearly justified by a link to political corruption than limits on other kinds of . . . political spending are (corruption being understood not only as <u>quid</u> <u>pro</u> <u>quo</u> agreements, but also as undue influence . . . and the appearance of such influence)." (internal citations omitted)).

The Supreme Court has rejected arguments that evidence of actual influence or corruption must be proffered to demonstrate a sufficiently important interest in preventing the appearance of corruption.  <u>McConnell</u>, 540 U.S. at 150 ("Our cases have firmly established that Congress's legitimate interest extends beyond preventing simple cash-for-votes corruption to curbing undue influence on an officeholder's judgment, and the appearance of such influence.") (internal quotations and citations omitted).  In fact, because the potential for undue influence is more difficult to detect than the cash-for-votes transaction and more difficult to criminalize, "[t]he best means of prevention is to identify and to remove the temptation."  <u>McConnell</u>, 540 U.S. at 153.

The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden."  <u>Shrink Missouri</u>, 528 U.S. at 392.  Instead, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or

down with the novelty and plausibility of the justification raised."  Shrink Missouri, 528 U.S. at

392.  Although the Court has suggested that there may be a need for more extensive evidentiary

documentation if those challenging the constitutionality of the regulation have made any showing

of their own to cast doubt on the corruption-related implications of the evidence in Buckley and of

the record in a particular case, in Shrink Missouri the Court specifically and explicitly rejected the

contention that post-Buckley decisions had enhanced the Government's burden beyond what

Buckley required.  Shrink Missouri, 528 U.S. at 394, 397.

   In the 1998 New York City Charter amendment referendum, New York City voters

were presented with the following question: "Shall the changes relating to the voluntary campaign

finance system, including (1) prohibiting corporate contributions, (2) requiring disclosure and

regulation of contributions by those doing business with the City of New York and regulation of

indirect campaign expenditures . . . be adopted?"  (Defs' 56.1 Stmt. at ¶ 19.)  The City's voters

answered in the affirmative, approving the Charter amendment in the November 1998 election.  (Id.

at ¶ 20.)  Although, as the Court recognized in Shrink Missouri, a majority vote cannot, as such,

defeat a First Amendment right, the existence of a popular vote in favor of contribution limits

certainly attests to the public perception that contribution limits are necessary to combat corruption

and the appearance of corruption.  Shrink Missouri, 528 U.S. at 393-94.  The vote in favor of the

referendum, like the vote in Shrink Missouri, thus constitutes evidence of a popular perception that

contributions by those doing business with the City need to be regulated in order to combat

corruption.  Shrink Missouri, 528 U.S. at 394 ("the statewide vote on Proposition A certainly

attested to the perception relied upon").

   The Defendants have also proffered various City Council, Commission and Board

reports discussing the need for "doing business" contribution limits to eliminate the possibility or

appearance of corruption.[10]   The Organization Amici have proffered numerous articles outlining

instances of "pay-to-play" scandals in the 1980s.  (See Org. Amici. Mem. At 5-6.)  Plaintiffs' own

deposition testimony evidences the existence of a public perception of corruption or the appearance

of corruption connected to the contributions of those doing business with the City.[11]  See Shrink

---

[10]     See, e.g., 1998 Commission Report at 19 ("The Commission identified several
categories of campaign contributions that, at a minimum create the perception that
those donors have the opportunity and desire to exercise undue influence over
elected officials.  The most obvious categories of donations that create this
perception are donations by City contractors and others doing business with the City.
. . Similarly, donations by registered lobbyists and their principals can create the
appearance of an attempt to purchase influence."); id. (Although there was no
evidence of actual influence, and donations were consistent with the law in effect at
the time, which did not prohibit such contributions, "[t]here is . . . no doubt that
these contributions have a negative impact on the public because they promote the
perception that one must 'pay to play.'"); 2005 Election Report at 122 ("'Doing
business' contributions create inequalities (real and perceived) in the political
marketplace."); 2006 Interim Report at i (initial findings of the study, commissioned
by the Board and conducted by students at New York University's Wagner Graduate
School of Public Service, included the "significant role that 'doing business'
contributors played in both the 2001 and 2005 election cycles.  Specifically, the
study preliminarily indicates that the individuals or entities 'doing business' with the
City accounted for some 27.5 percent of donations in the 2001 election cycle ($15.6
million out of $56.8 million donated) and 22.3 percent of donations in the 2005
election cycle ($9.4 million out of $42.3 million donated)."); id. at ii (although "data
do not provide direct evidence of a 'pay-to-play' culture in New York City . . . there
are still citizens and businesspeople who believe that special interest donors wield
undue influence over government officials, and that 'pay-to-play' is the dominant
modus operandi"); Committee Report at 24-25 ("[w]hile there is nothing
intrinsically wrong with contributions from those doing business with the City, the
ability of such individuals to contribute could create a perception, regardless of
whether such perception is accurate, that such individuals have a higher level of
access to the City's elected officials.  It is important to eradicate this perception and
reduce the appearance of undue influence associated with contributions from
individuals doing business with the City.").

[11]     See e.g., Pines Decl., Ex. JJ, Deposition of Thomas V. Ognibene at 31-32 ("Q: In
your view, is there a public perception that campaign contributions by persons that
have business dealings with the City may influence the actions of elected officials?
A: Yes."); see also Pines Decl., Ex. LL, Deposition of Fran Reiter at 52 ("Q: Do you
believe there is a public perception that campaign contributions by lobbyists may
influence, or affect their ability to influence, elected officials?  A: Yes."); Pines

Missouri, 528 U.S. at 393 (Affidavit from state senator stating that large contributions have the real potential to buy votes, newspaper accounts of large contributions supporting inference of impropriety, and a statewide vote indicating a public perception that contribution limits are necessary to combat corruption constituted sufficient evidence of an important government interest justifying contribution limits).

Defendants have also offered evidence that the New York City Council's intent in enacting the specific provisions at issue here was to eliminate corruption and the perception of corruption.  See e.g., Pines Decl., Ex. P, Public Hearing on Proposed Local Laws, Int. No. 586-A, July 3, 2007 ("July 3, 2007, Signing Ceremony") (Speaker Quinn identified as the first of three legislative goals for Local Law 34 "to come up with the strongest system possible to limit the perception of influence by those who are trying to – who do or are trying to do business with the City of New York, as it relates to campaign contributions."); id. at 1 (Mayor Bloomberg stated that the law "will finally fulfill the voters' mandate by requiring the disclosure of contributions from those who do business with the City, reduce the amounts that candidates may accept from such contributors, and eliminate public matching funds for such contributions.  These new provisions will strengthen the integrity of City government and enhance its transparency.").

Plaintiffs argue that news articles and general public perception of corruption are insufficient evidence of a government interest justifying the lower "doing business" contribution limits.  Plaintiffs rely on language in a footnote in Democratic Party v. National Conservative

_____

Decl., Ex. NN, Deposition of Viviana Vazquez-Hernandez at 44 ("Q: . . . And based on your experience, do you also think that there is a perception that campaign contributions from lobbyists might influence the actions of elected officials?  A: Yes."); id. (acknowledging that those doing business with the City tend to favor incumbents when they make contributions because those contributors want influence).).

Political Action Comm., 578 F. Supp. 797 (E.D. Pa.1983) ("NCPAC"), aff'd in part and rev'd in part by Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480 (1985) stating that "[i]f we were to allow the charges of journalists automatically to create a presumption that corruption exists or that people believe corruption exists, a group of writers, no matter how unlikely the tales they tell, could rescue statutes otherwise abridging the free speech of those not employed by traditional, established media outlets."  NCPAC, 578 F. Supp. at 830, n. 47.  However, Plaintiffs take the language out of context; NCPAC concerned campaign expenditure limits, a species of speech constraint that, unlike contribution limits, is subjected to strict scrutiny.

Furthermore, the media reports at issue in NCPAC were hearsay accounts proffered as evidence of actual corruption.  The court found no hearsay problem as to their use for showing a public perception of corruption (as opposed to corruption in fact).  NCPAC, 578 F. Supp. at 828-29.  Rejecting much of the proffered evidence as irrelevant to the particular issues presented, the three-judge district court panel in that case had instead noted that courts have the ability to go beyond the formal rules of evidence and consider "legislative facts."  NCPAC, 578 F. Supp. at 830. "In seeking to determine the rationality of a given measure in meeting permissible goals, the court may examine scholarly articles not formally submitted or may guide its conclusions by reasonable exercise of its deductive powers."  Id.  The court then used a reasonable person standard to determine the potential for quid pro quo corruption.  Id. 830-31.  The court applied the reasonable person standard to determine "whether press reports can give rise to a belief that corruption exists" instead of allowing a journalist's charge to create an automatic presumption that corruption exists. Id. at 830, n. 47.  Thus, although newspaper articles do not create an automatic presumption of corruption, they may be considered, along with "legislative facts," in determining whether a reasonable person would believe that corruption or the potential for corruption exists.  Id. at 830.

Here, the challenged provisions are not limits on independent expenditures, but instead are campaign contribution limits, which are reviewed under a lesser degree of scrutiny and which the Supreme Court has noted are more clearly justified by a link to corruption. Colorado Republican, 533 U.S. at 440-441.

In this case, where the Defendants' proffered justifications – the need to reduce or eliminate both corruption or undue influence and the appearance of corruption or undue influence – are neither novel nor implausible, and Plaintiffs have made no showing of their own that would require a specific evidentiary response in support of Defendants' proffered justification, the Court finds that Defendants have met their burden of demonstrating that the limits in question are designed to address a sufficiently important governmental interest. Defendants have proffered substantial evidence of the existence of a public perception of corruption or the potential for corruption by those doing business with the City, and of a legislative intent to eliminate that corruption or appearance of corruption in enacting the lower "doing business" contribution limits challenged here.[12]____

_____

[12] Nor is Plaintiffs' argument that Defendants must identify actual instances of corruption persuasive. Plaintiffs attempt to conflate two different sufficiently important governmental interests – actual corruption or influence and the appearance of corruption or influence – into a single interest, arguing that where there is no evidence of actual corruption or influence, neither can there exist the appearance of such. The Supreme Court has previously rejected this argument, identifying both the difficulty of detecting actual corruption and the equal importance of eliminating the appearance of corruption. McConnell, 540 U.S. at 153; Buckley, 424 U.S. at 27. "Democracy works only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." Shrink Missouri, 528 U.S. at 390 (internal quotations omitted). The absence of evidence of actual corruption, where Defendants have provided sufficient evidence of a public perception of corruption and where the Supreme Court has previously rejected Plaintiffs' argument that some "special justification" beyond that traditionally accepted by courts as sufficient to meet the government's burden, is not a basis for holding that

     C.     Whether Recent Supreme Court Decisions Require a "Special Justification"
               for Non-Indexed and Disparate Contribution Limits

Plaintiffs argue that several post-Buckley cases, specifically Randall v. Sorrell, 548 U.S. 230 (2006) and Davis v. Federal Election Commission, 128 S. Ct. 2759 (2008), require the City, in this case, to show a special justification for the "doing business" contribution limits because those limits are low relative to others that have been held constitutional and because the limits are not indexed for inflation.  In Randall, the Supreme Court held unconstitutional a Vermont campaign finance regulation structure that included expenditure caps and very low across-the-board contribution limits.   Noting that the Vermont contribution limits were substantially lower than both the limits previously upheld and comparable limits in other states, a plurality of the Court held that the lower dollar limits and certain other aspects of the structure, including the lack of indexing for inflation, constituted danger signs that the challenged limits "may fall outside tolerable First Amendment limits" by preventing candidates from "amassing the resources necessary for effective [campaign] advocacy" and by magnifying the advantages of incumbency.  Randall, 548 U.S. at 248, 253 (emphasis added; internal citations omitted).  Under these circumstances, the Court instructed, the record must be examined closely and independently to determine whether the contribution limits are sufficiently closely drawn to pass constitutional muster under Buckley and its progeny. The Court's subsequent determination that the limits were too restrictive was based on a consideration of five aspects of the limits, including the lack of an indexing provision, which together (and in light of evidence that the challenged provisions in fact gave advantages to incumbents, limited the capacity of challengers to amass sufficient funds to run in competitive

_____

the City has failed to establish a sufficiently important governmental interest.  See also section II.C infra.

races and limited the right of association through a political party by subjecting parties and their affiliates to the same limits as individual contributors) led the Court to conclude that the contribution limits were not narrowly tailored.

Plaintiffs have seized upon the one provision of the Vermont limits that has a precise parallel in the New York scheme – lack of indexing of limits that are relatively low – and the Randall Court's focus on the lack in the record in that case of "any special justification that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems that we have described," arguing that the Buckley corruption/appearance of corruption prevention rationale is, by virtue of the Randall Court's search for a special justification, insufficient to support a limit that is not indexed. See Randall, 548 U.S. at 261. Randall imposes no such general evidentiary standard for non-indexed limits. Rather, the Randall plurality's inquiry as to the existence of a special justification in that case was part and parcel of its analysis of whether limits that it had found inhibited the amassing of necessary campaign funds and constrained associational rights to an unusual degree were closely drawn to address sufficiently serious interests. The fact-intensive threshold issue of unusual constraints on candidates' fundraising or contributors' associational rights is not addressed in this motion practice. Accordingly, to the extent Plaintiffs contend that Randall compels a finding of facial unconstitutionality in the absence of indexing provisions, their argument fails.

Plaintiffs' argument that the Supreme Court's decision in Davis v. Federal Election Commission, 128 S. Ct. 2759 (2008), similarly requires a "special justification" where there are "different limits for different people" (Pls' Opp. at 6) also fails. In Davis, the Court considered a challenge to the "Millionaires' Amendment" that had been added to federal election law by the Bipartisan Campaign Reform Act. Davis, 128 S. Ct. at 2766. Under the provision challenged in

Davis, when a "self-financing" candidate's personal expenditures (and certain other fundraising) exceeded $350,000, an asymmetrical regulatory scheme came into play: the self-financing candidate remained subject to normal contribution limits, while the non-self-financing opponent could receive individual contributions at triple the normal limits and could receive unlimited coordinated party expenditures. Davis, 128 S. Ct. at 2766. The Davis Court analyzed the Millionaire's Amendment as a restriction on expenditures and thus applied strict scrutiny. In so doing, the Court focused on the burden placed on First Amendment expressive rights by forcing a candidate to choose between limiting personal expenditures and being subject to a scheme that increased the resources available to his opponent. See Davis, 128 S. Ct. at 2772. The standard applied by Davis to expenditure limits is inapplicable to the contribution limits that are at issue on the instant motion practice. Davis did not change the level of scrutiny applicable to contribution limits. Indeed, the Davis Court reiterated that "[a] contribution limit . . . must be closely drawn to serve a sufficiently important interest." Davis, 128 S. Ct. at 2772, n. 7.

Nor, contrary to the suggestion in Plaintiffs' papers, did the Davis Court create some additional requirement of a "special justification" where regulations impose different contribution limits on different contributors. The Davis Court's pronouncement regarding disparate contribution limits addressed those situations in which candidates, not contributors, for the same position are subject to different limits. See Davis, 128 S. Ct. at 2771 ("[w]e have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other"). In contrast, courts have upheld disparate contribution limits on contributors. See e.g., In re Earle Asphalt, 950 A.2d 918, 927 (N.J. Super. 2008) (upholding statute preventing any state agency from awarding a contract with a value over $17,500 to a business entity that has contributed more than $300 during the preceding eighteen months to the Governor,

candidates for Governor or any State or county political party as constitutional); see also Blount v. S.E.C., 61 F.3d 938, 944 (D.C. Cir. 1995) (upholding SEC rule limiting contributions by securities professionals to state officials from whom they solicit or obtain business); Federal Election Commission v. Weinstein, 462 F. Supp. 243, 249 (S.D.N.Y. 1978) (upholding prohibitions on certain political contributions by government contractors); see also Federal Election Commission v. Beaumont, 539 U.S. 146, 161 (2003) (rejecting argument that where contributions were banned on the basis of their source, strict scrutiny was the applicable standard of review, and holding that the contribution limits must satisfy the "lesser demand of being closely drawn to match a sufficiently important interest") (internal quotations omitted).

Thus, contrary to Plaintiffs' position, Randall and Davis do not require that the City, in this case, offer a special justification for the challenged contribution limits beyond the existence of a sufficiently important governmental interest.  As explained above, Defendants have proffered sufficient evidence to establish that the "doing business" limitations are directed to protection of a sufficiently important governmental interest to pass the first prong of the Buckley contribution limits test.  See Shrink Missouri, 528 U.S. at 391 ("[t]he quantum of empirical evidence needed . . . will vary up or down with the novelty and plausibility of the justification raised;" the corruption rationale in the campaign contributions context is neither novel nor implausible).

The Court now turns to the question of whether the contribution limits at issue are closely drawn to the important government interest of preventing corruption or its appearance.

D.      Are the Provisions Closely Drawn?

Plaintiffs challenge the tailoring of the "doing business" provisions, arguing that they are not closely drawn.  Plaintiffs assert that the provisions are overbroad, underinclusive and overinclusive.  Plaintiffs also challenge the tailoring of the provisions on the grounds that they are

not indexed for inflation and, according to Plaintiffs, discriminate on the basis of viewpoint.

    1.  <u>Overbreadth Challenge</u>

Plaintiffs argue that the challenged provisions are overbroad because they limit contributions from individuals and entities that would never seek to buy influence and that, "when government wants to prevent fraudulent activity, it should ban the fraud, not ban legitimate activity." (Pls' Opp. at 20, citing <u>Turner Broadcasting System, Inc. v. Fed. Elec. Comm'n</u>, 512 U.S. 622 (1994).) Plaintiffs' overbreadth challenge fails; the <u>Buckley</u> Court addressed and rejected nearly identical arguments and Plaintiffs have not provided any grounds for distinguishing that decision.

In <u>Buckley</u>, the Supreme Court assumed the truth of the proposition that most of the large contributors affected by a campaign contribution limitation do not seek improper influence, <u>Buckley</u>, 424 U.S. at 29, and dismissed the overbreadth argument, stating "[n]ot only is it difficult to isolate suspect contributions, but more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." <u>Buckley</u>, 424 U.S. at 29-30. As in <u>Buckley</u>, the concern here is not only with thwarting contributors' actual attempts to buy influence, but with eliminating the appearance of impropriety. The <u>Buckley</u> Court also rejected an argument that the contribution limits had to be invalidated because bribery laws and disclosure requirements were a less restrictive means of addressing proven and suspected <u>quid pro quo</u> arrangements. <u>Buckley</u>, 424 U.S. at 27. "[L]aws making criminal the giving and taking of bribes deal with only the most blatant and specific attempts of those with money to influence governmental action." <u>Buckley</u>, 424 U.S. at 27-28.

The provisions challenged here are intended to eliminate not only the "fraud"

(corruption), but also the appearance of such fraud; they are not overbroad merely because they constrain activity that could result in the appearance of, as opposed to actual, corruption.

Furthermore, as noted above, the lower "doing business" contribution limits do not apply to everyone; they apply only to those who have already been identified as obtaining or seeking some benefit from the City.  And even amongst those obtaining or seeking a benefit, the lower contribution limits do not implicate every business dealing, but focus on those business dealings with the greatest chance of being subject to or creating the appearance of corruption.  The lower business dealing limitations apply to lobbyists, whose very function is to attempt to influence New York City elected officials,[13] and with respect to transaction-based business dealings the lower contribution limit is only implicated where the transaction exceeds a certain value.  (See N.Y.C. Admin. Code § 3-702(18) ("all contracts, concessions, franchises and grants that are five thousand dollars or less in value shall be excluded from any calculation as to whether a contract, concession,

---

[13]     Section 3-211, the definition section referenced in section 3-702(18), defines "lobbyist" as "every person or organization retained, employed or designated by any client to engage in lobbying," and defines "lobbying" or "lobbying activities" as "any attempt to influence: (i) the passage or defeat of any local law or resolution by the city council, (ii) the approval or disapproval of any local law or resolution by the mayor, (iii) any determination made by an elected city official or an officer or employee of the city with respect to the procurement of goods, services or construction, including the preparation of contract specifications, or the solicitation, award or administration of a contract, or with respect thee [sic] solicitation, award or administration of a grant, loan, or agreement involving the disbursement of public monies, (iv) any determination made by the mayor, the city council, the city planning commission, a borough president, a borough board or a community board with respect to zoning or the use, development or improvement of real property subject to city regulation, (v) any determination made by an elected city official or an officer or employee of the city with respect to the terms of the acquisition or disposition by the city of any interest in real property, with respect to a license or permit for the use of real property of or by the city, or with respect to a franchise, concession or revocable consent, (vi) the adoption, amendment or rejection by an agency of any rule having the force and effect of law, (vii) the outcome of any rate making proceeding before an agency, or (viii) any determination of a board or commission." N.Y.C. Admin. Code §§ 3-211(a); 3-211(c)(1).

franchise or grant is a business dealing with the city").)  Thus, the contribution limits have been

closely drawn to apply to those whose business dealings are most likely, based on their nature or

magnitude, to implicate the government's interest in eliminating corruption and the appearance of

corruption.

                2.  Underinclusiveness Challenge

          Plaintiffs argue that the challenged provisions are underinclusive because the City

has not included in its lower contribution limits, or prohibited contributions from, all those with the

influence and incentive to engage in pay-to-play.  Specifically, Plaintiffs contend that the limits are

defective because they are inapplicable to labor organizations, neighborhood associations, and their

respective officers.  (Pls' Opp. at 18-19.)  Plaintiffs have, however, conceded that several labor

organizations or union-affiliated entities, including municipal labor organizations, have

procurement contracts with the City or an affiliated agency that are considered "business dealings"

under the law.  (Defs' 56.1 Stmt. at ¶ 114; admitted in Pls' 56.1 Stmt. at ¶ 114; <u>see also</u> Schaffer

Decl. ¶ 40.)  Additionally, Plaintiffs have conceded that the definition of "lobbyist" for the purpose

of the doing business database includes unions.  (Defs' 56.1 Stmt. at ¶¶ 103- 104; admitted in Pls'

56.1 Stmt. at ¶¶ 103-104.)  Thus, the crux of Plaintiffs' underinclusiveness argument with respect

to labor organizations appears to be that, even where these organizations do not engage in the same

types of "business dealings" as covered entities, they have similar pay-to-play incentives – an

incentive to ensure that businesses that the unions provide services for obtain City contracts and

concessions – and the challenged provisions should reflect and eliminate that incentive.

Defendants contend that the lower limits do apply to labor organizations to the extent that they are

engaged in covered activity, but have conceded that the Administrative Code's "business dealings"

definition does not encompass collective bargaining with City unions, or employer-employee

relationships for non-unionized employees.  (Defs' 56.1 Stmt. at ¶ 54.)  Plaintiffs argue that these

latter two relationships pose as much potential for corruption as the relationships that are within the

scope of the definition of business dealings.  Plaintiffs also contend that the exception for

neighborhood organizations engaged in certain transactions with the City is indicative of fatal

underinclusiveness.[14]

       Neither the narrow exception for certain neighborhood or community association

applications nor Plaintiffs' arguments with respect to labor organizations warrants a finding of

unconstitutional underinclusiveness.  The fact that the legislature did not prohibit or limit from

making contributions every entity or individual that might have an incentive to curry favor in

connection with negotiations with the City does not render the challenged provisions

underinclusive.  "[A] regulation is not fatally underinclusive simply because an alternative

---

[14]     Plaintiffs assert that neighborhood organizations are categorically and wrongly
excluded from the "doing business" limitations. (See Transcript of Nov. 25, 2008,
Oral Argument, at 35:6-20 (citing N.Y.C. Admin. Code § 3-702(20).)  Defendants
contend that the lower "doing business" limits are applicable to neighborhood
associations with one narrow exception; the doing business database does not
include individuals from a neighborhood, community or similar association of local
residents or homeowners organized on a non-profit basis, that has applied for
rezoning of its local neighborhood.   (See Defs' 56.1 ¶ 91; N.Y.C. Admin. Code § 3-
702(20); Charter §§ 197-c(a)(3); 201.)   The cited Administrative Code section
provides that, in connection with the doing business database: "the term 'person'
shall include an entity that has business dealings with the city, any chief executive
officer, chief financial officer and/or chief operating officer of such entity or persons
serving in an equivalent capacity, any person employed in a senior managerial
capacity regarding such entity, or any person with an interest in such entity which
exceeds ten percent of the entity provided, however, that 'entity' for purposes of this
definition shall not include a neighborhood, community or similar association
consisting of local residents or homeowners organized on a non-profit basis where
such association is the applicant pursuant to subsection (3) of subdivision (a) of
section 197-c of the charter or pursuant to section 201 of the charter or is a parent
company or an affiliated company of an entity."  N.Y.C. Admin. Code § 3-702(20).
Sections 197-c and 201 of the Charter relate to zoning changes and special permits.
Section 3-702(20) is thus consistent with Defendants' description of a narrow
exception with respect to neighborhood associations.

regulation, which would restrict more speech or the speech of more people, could be more effective."  Blount v. S.E.C., 61 F.3d 938, 946 (D.C. Cir. 1995); see also Buckley, 424 U.S. at 105 ("In deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did.") (internal quotations and citations omitted).  Furthermore, even assuming the truth of Plaintiffs' argument regarding the incentives driving labor organizations, the legislature need not address all aspects of a problem at the same time; reform may be made one step at a time. Buckley, 424 U.S. at 105 (legislature may first address "itself to the phase of the problem which seems most acute to the legislative mind.").

                          3.   Are the Limitations on Lobbyists Overinclusive?

        Plaintiffs argue that the "doing business" provisions are overinclusive because they can be applied using the Administrative Code section 3-702(16), definition of the term "lobbyist," which includes not only anyone defined as a lobbyist under Administrative Code section 3-211(a) ("every person or organization retained, employed or designated by any client to engage in lobbying"), but also the spouse, domestic partner and unemancipated children of such a person, the officers and employees who engage in lobbying activities or are employed in the lobbying division of a lobbyist organization, and the spouse or domestic partner or unemancipated minor of such officer or employee.  In light of the Defendants' representation that the broader definition is not being applied and that the CFB has "recently clarified that, for the purpose of those contribution limits, 'lobbyist' shall have the narrower scope of § 3-211(a), " see Defs' Mot. for. Summary Judgment at n. 4; Defs' Am. Reply Mem. at 5, prudence and the doctrine of constitutional avoidance lead the Court to consider on this motion practice only the application of the limits to the

"lobbyists" currently subject to the limits under the section 3-211(a) definition.[15]

The Supreme Court has noted evidence in prior campaign finance cases of lobbyists' attempts to obtain influence with federal officials.  See e.g., McConnell, 540 U.S. at 147 ("For their part, lobbyists, CEOs, and wealthy individuals alike all have candidly admitted donating substantial sums of soft money to national committees not on ideological grounds, but for the express purpose of securing influence over federal officials.").  Plaintiffs' own evidence confirms the existence of a public perception that campaign contributions made by lobbyists could result in undue influence.  (See Pines Decl., Ex. LL, Deposition of Fran Reiter at 52 ("Q: Do you believe there is a public perception that campaign contributions by lobbyists may influence, or affect their ability to influence, elected officials?  A: Yes."); Pines Decl., Ex. NN, Deposition of Viviana Vazquez-Hernandez at 44 ("Q: . . . And based on your experience, do you also think that there is a perception that campaign contributions from lobbyists might influence the actions of elected officials?  A: Yes.").)  Plaintiffs' facial constitutional challenge to the application of the lower contribution limit to "lobbyists" (as defined by the narrower, section 3-702(18) provision and section 3-211(a)), fails because the inclusion of those engaged in lobbying activities under the "doing business" contribution limits is consistent with, and no broader than necessary to address, the City's interest in eliminating corruption and the appearance of corruption.

4.  Must the Limitation be Indexed to be Closely Drawn?

Plaintiffs, again invoking the Supreme Court's plurality opinion in Randall, argue that the lower business-dealing limits are not "closely drawn" because they are not indexed for inflation.  However, as explained above, the lack of indexing was only one of five factors that,

---

[15]   Under the doctrine of constitutional avoidance, the Court is "obligated to construe the statute to avoid constitutional problems if it is fairly possible to do so."  Boumediene v. Bush, 128 S. Ct. 2229 (2008).

taken together, led the Court to conclude that the challenged act's contribution limits were not closely drawn, but disproportionately burdened numerous First Amendment rights.  Randall, 548 U.S. at  261-62.  Randall thus does not provide the requisite support for Plaintiffs' argument that "constitutionally permissible contribution limits will [always] be indexed for inflation."  (Pls' Opp. at 21.)  To the extent that Plaintiffs assert that the "doing business" limits are not closely drawn simply because the Administrative Code fails to index those limits for inflation, Plaintiffs' argument is unavailing.

      E.      Do the Limitations Unconstitutionally Effect Viewpoint Discrimination?

"Viewpoint discrimination is a "subset or particular instance of the more general phenomenon of content discrimination," in which "the government targets not subject matter but particular views taken by speakers on a subject."  Make The Road by Walking, Inc. v. Turner, 378 F.3d 133, 150 (2d Cir. 2004), quoting Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 829, 831 (1995) (internal citations omitted).  Viewpoint discrimination is a particularly egregious type of content discrimination, and the Supreme Court has long held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  Morse v. Frederick, 127 S.Ct. 2618, 2644 (2007), quoting Rosenberger, 515 U.S. at 829.

Without making any supporting evidentiary proffers, Plaintiffs argue that the challenged provisions discriminate on the basis of viewpoint because the speech of neighborhood, community and labor organizations "has a significantly different viewpoint than the speech of owners of business and members of management" and the former group is not subject to the "doing business" limitations.  (Pls' Opp. p. 22.)  As noted above, Plaintiffs have not established that neighborhood, community and labor organizations are as a group categorically excluded from the

challenged provisions.  Furthermore, Plaintiffs have offered absolutely no evidence of or case law

supporting the contention that these organizations speak with a single voice or share a single

viewpoint.

Nor have Plaintiffs offered any evidence that the particular groups that are

admittedly outside the scope of or exempted from the restrictions – i.e., municipal unions engaged

in collective bargaining, neighborhood associations making rezoning applications – share a

particular viewpoint.  Instead Plaintiffs offer only a conclusory assertion that the "viewpoint" of

neighborhood, community and labor organizations is such that a candidate receiving contributions

from business owners and members of management would not also receive contributions from

these organizations.  This assertion is inconsistent with Plaintiffs' own evidence.  (See Pines Decl.,

Ex. JJ, Deposition of Thomas V. Ognibene at 28, 29, 31 (stating that "social service agencies

support Democratic candidates" and "unions support Democratic candidates," but acknowledging

that "law enforcement and uniformed services are much more willing to cross that line" to support

Republican candidates and that "[t]he police unions have supported me over the years, the PBA,

firefighters and people like that.").)  Thus, Plaintiffs' viewpoint challenge to the business dealings

provision fails.

To the extent that Plaintiffs assert a facial Fourteenth Amendment challenge to the

provisions on the grounds that they effect impermissible viewpoint discrimination, Plaintiffs' facial

challenge fails for the same reason as their facial First Amendment challenge.

### III. Non-Matching Provisions

Plaintiffs also challenge the designation in section 3-702(3) of the Administrative

Code of certain contributions as non-matchable (the "non-matching provisions").  Section 3-702(3)

excludes, from the definition of a "matchable contribution," contributions from individuals who are

subject to the lower "doing business" limits, including lobbyists, as well as contributions from any

other persons required to be included in a statement of registration pursuant to section 3-213(c)(1).

According to section 3-213(c)(1), the spouse or domestic partner of a lobbyist and, if the lobbyist is

an organization, any officer or employee of such lobbyist who engages in any lobbying activity or

who is employed in a division of the organization that engages in lobbying activity, and the spouse

or domestic partner of such officer or employee, are to be included on the registration statement.

See N.Y.C. Admin. Code § 3-213(c)(1).[16]

        Plaintiffs argue that the City needs a special justification to sustain the

constitutionality of these provisions, quoting Buckley for the proposition that "the concept that

government may restrict the speech of some elements of our society in order to enhance the relative

voice of others is wholly foreign to the First Amendment."  Buckley, 424 U.S. at 48-49.  However,

in making this statement, the Buckley Court was rejecting an argument that limits on independent

expenditures – expenditures for express advocacy of candidates made totally independently of the

candidate and his campaign – could be justified "by the ancillary governmental interest in

equalizing the relative ability of individuals and groups to influence the outcome of elections."

Buckley, 424 U.S. at 48.  The Supreme Court had already determined that, unlike contribution

limits, the independent expenditure limits had not been shown to serve any substantial

governmental interest in stemming the reality or appearance of corruption in the electoral process,

and was rejecting this alternative basis for the limitations.  Buckley, 424 U.S. at 47-48.

---

[16]    A separate provision excludes from the definition of "matchable contributions" any "contributions from individuals under the age of eighteen years."  N.Y.C. Admin. Code § 3-702(3)(e).  To the extent that Plaintiffs' references to "unemancipated minors" in connection with the non-matching provisions is an attempt to challenge the provision making contributions from individuals under eighteen years of age ineligible for matching, Plaintiffs' challenge fails for the same reasons that Plaintiffs' challenge to the other non-matching provisions fails.

The non-matching provisions challenged here do not restrict the amounts that candidates or interest groups can spend.  Rather, they affect the ultimate monetary value of contributions and thus are similar in effect to contribution limits.  Accordingly, they are appropriately analyzed under the contribution limit standards.  In effect, they limit the amount that those "doing business" with the City can contribute, directly or indirectly.  The justification that Defendants rely on here is not that Defendants are attempting to restrict the speech of "doing business" contributors in order to amplify the voice of those who do not do business with the City; instead, it is the same justification that underlies the contribution limits themselves – the prevention of corruption and the appearance of corruption.

As explained above, the contribution limits on those doing business with the City are constitutional because they are closely drawn to a sufficiently important governmental interest. The non-matching provision for those contributors subject to the lower "doing business" limits and persons closely related to them is constitutional for the same reasons.  Furthermore, requiring the City to use taxpayer dollars to match contributions that the legislature has determined present a risk of corruption or the appearance of corruption sufficient to require lower limits would be inconsistent with anti-corruption goals.

Plaintiffs also assert a facial challenge to the application of the non-matching provisions to a lobbyist's spouse, domestic partner, and employees and children who are not otherwise subject to the lower "doing business" limits as unconstitutionally overbroad and overinclusive.  See N.Y.C. Admin. Code §§ 3-703(3); 3-213(c)(1).  Defendants argue that excluding contributions from this broader category of persons from the definition of "matchable contributions" is justified by a sufficiently important governmental interest – preventing circumvention of the individual contribution limits, and note that those persons are able to make

contributions that are not subject to the lower "doing business" limitations.

In McConnell, the Court noted that "because the First Amendment does not require [the legislature] to ignore the fact that candidates, donors, and parties test the limits of the current law, [the interest in combating the appearance or perception of corruption] ha[s] been sufficient to justify not only contribution limits themselves, but laws preventing the circumvention of such limits." McConnell, 540 U.S. at 144 (internal quotations and citations omitted).   In Colorado Republican, the Court confirmed that "circumvention is a valid theory of corruption."  Colorado Republican, 533 U.S. at 456.  As explained in the preceding section of this Opinion, the Supreme Court has recognized that lobbyists have attempted to obtain influence with federal officials in the past.  See McConnell, 540 U.S. at 147.  In allowing the lobbyist's spouse, employees and others subject to the non-matching provision, but falling outside the scope of the narrower business-dealings contribution limit, to contribute at the normal level, but also designating those individuals' contributions as non-matchable the City has balanced concerns regarding infringing the speech of those not actually engaged in lobbying activities with a desire to prevent circumvention of valid contribution limits on lobbyists.  The Supreme Court has long recognized that substantial deference is owed to legislative determinations regarding campaign contribution restrictions.  See, e.g., Federal Election Commission v. Beaumont, 539 U.S. 146, 155 (2003) ("And we have understood that such deference to legislative choice is warranted particularly when Congress regulates campaign contributions."); McConnell, 540 U.S. at 137 (the less rigorous standard of review applicable to contribution limits shows proper deference to the legislature and "provides [the legislature] with sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process."); Shrink Missouri, 528 U.S. at 402 (Breyer, J. concurring) ("Where a legislature has significantly greater institutional expertise, as,

for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments – at least where that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge.").

## IV. Expanded Corporate Provisions

The challenged Administrative Code provisions extended a pre-existing ban on contributions from corporations to cover limited liability companies, limited liability partnerships, and general partnerships (collectively "covered entities").  N.Y.C. Admin. Code § 3-703(1-l). Plaintiffs challenge this expansion, arguing that Defendants can offer no sufficient justification for including these covered entities, and that the provision is overinclusive, underinclusive, and overbroad.

A.    Legal Standard

In Federal Election Commission v. Beaumont, 539 U.S. 146, 161 (2003), the Supreme Court identified the level of scrutiny applicable to this aspect of Plaintiffs' challenge.  In Beaumont, a nonprofit advocacy corporation challenged the constitutionality of a federal statute and related regulations that placed the corporation under the general ban on direct corporate contributions in connection with federal elections.  Beaumont, 539 U.S. at 156.  The corporation argued that strict scrutiny was required where contribution limits were not merely limited, but banned entirely on the base of their source.   The Court rejected this argument because "the degree of scrutiny turns on the nature of the activity regulated," which in Beaumont, as in this case, was campaign contributions, and "restrictions on political contributions have been treated as merely 'marginal' speech restriction subject to relatively complaisant review."  Id. at 161-62.  The Court further noted that corporate contributions are, amongst contributions generally, furthest from the core of political expression because a corporation derives its speech and associational rights from

its members; a ban on direct corporate contributions leaves the individual members free to make

their own contributions.  Id. at 162, n. 8.  The Court applied the standard that it has consistently

used to review campaign contribution limits: a contribution limit involving significant interference

with associational rights is constitutional if it is closely drawn to match a sufficiently important

governmental interest, noting that the time to consider the difference between a ban and a limit is

"when applying scrutiny at the level selected, not in selecting the standard of review itself."  Id. at

162.  Thus, section 3-703(1-l), which regulates campaign contributions and is challenged insofar as

it applies to covered entities (whose members are otherwise free to make their own contributions),

survives if it satisfies the "lesser demand of being closely drawn to match a sufficiently important

interest."  Beaumont, 539 U.S. at 161.

        B.      Have Defendants Demonstrated a Sufficiently Important Governmental Interest?

        In Beaumont, the Supreme Court outlined "a century of congressional efforts to curb

corporations' potentially deleterious influences on federal elections."  Id. at 152 (internal quotations

omitted).  As the Court noted, the first federal campaign finance law banned all corporations from

making any money contributions in connection with federal elections and subsequent legislative

attention has strengthened and expanded the original, core prohibition on direct corporate

contributions.  Id. at 153.  The Beaumont Court recognized that the rationale underlying the

prohibition – preventing corruption or the appearance of corruption – has endured and new reasons

for regulating corporate electoral involvement have emerged in light of the increased restrictions on

individual contributions.  Id. at 155.  Specifically, the Court recognized that "restricting

contributions by various organizations hedges against [the] use [of those organizations] as conduits

for circumvention of valid contribution limits."  Id. at 155 (internal quotations and citations

omitted).  The Court then upheld the applicability of the provision banning direct contributions to

the nonprofit advocacy corporation.

The fundamental concern in cases involving regulating corporate campaign activity has been to prevent the use of wealth amassed by the corporation from investors and business activities as a "political war chest" that could promote corruption or the appearance of corruption. Austin v. Michigan State Chamber of Commerce, 494 U.S. 652, 658-659 (1990) ("We therefore have recognized that the compelling governmental interest in preventing corruption supports the restriction of the influence of political war chests funneled through the corporate form.");[17] Beaumont, 539 U.S. at 154.

In upholding the constitutionality of Michigan's restriction on corporate political expenditures in Austin, the Court focused on an additional corruption concern: "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas," such that political discourse can be unfairly affected by deployment of such war chests in disproportionate promotion of ideas that may not have popular support.  Austin, 494 U.S. at 660.  In Austin, the Court found this justification sufficiently compelling to uphold limits on independent expenditures by corporations under a strict scrutiny review.  Austin, 494 U.S. at 660. The restrictions on corporate contributions have "done further duty in protecting the individuals who have paid money into a corporation . . . for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed." Beaumont, 539 U.S. at 155.  The Supreme Court has also recognized what it characterized as an

---

[17]     Plaintiffs note their "objection" to Austin, which upheld a ban on corporate contributions, in their motion for injunctive relief.  (Pls' PI Mem. 14, n. 1.)  This Court's duty here is to apply binding Supreme Court precedent and not to reconsider Austin.

emerging justification for regulating corporate contributions: to prevent circumvention of

individual contribution limits by channeling money through corporations.  Beaumont, 539 U.S. at

155.

       In Austin, the Supreme Court identified special advantages state law granted to

corporations,  including "limited liability, perpetual life, and favorable treatment of the

accumulation and distribution of wealth," some of which are shared by the additional covered

entities that are subject to New York City's restrictions.  Austin, 494 U.S. at 658-659.  Plaintiffs

focus on the difference in structure between traditional corporations and such covered entities,

arguing that the latter do not enjoy the same special advantages as traditional corporations under

state law.  Thus, according to Plaintiffs, the covered entities do not pose the same concerns as

traditional corporations and Defendants have no legitimate interest in prohibiting contributions

from these non-corporate types of business entities.

       Plaintiffs' focus on details of the structure of the entities ignores the core concerns

that underlie the validity of restrictions on corporate contributions – preventing corruption and the

appearance of corruption by preventing the use of business forms to deploy business assets,

amassed for business reasons from various sources, for political ends.  The City Council

specifically identified circumvention concerns in connection with the expanded corporate ban.

According to the Committee Report, "permitting these [covered] entities to contribute has been a

way to subvert the contribution limits because the Board rules only require that organizational

contributions be attributed to the partner or owners where the contribution is greater than two

thousand five hundred dollars."  (Committee Report at 19.)

       The Court finds that these concerns exist with equal force in connection with

covered entities: such entities are also in a position to create "political war chests" that could be

used to create actual or apparent undue influence and which do not reflect public support for the

political ideas espoused, they could use member contributions in contravention of member political

preferences, and individual members could circumvent contribution limits by contributing through

the covered entities.  Differences in structure do not warrant differential treatment of traditional

corporations and covered entities with respect to the existence of a sufficiently important

governmental interest justifying the regulation of those entities' campaign contributions.  See

Beaumont, 539 U.S. at 157 ("the Court in [Federal Election Commission v. National Right to Work

Committee, 459 U.S. 197 (1982)] had rightly concluded that Congress might include, along with

labor unions and corporations traditionally prohibited from making contributions to political

candidates, membership corporations, though contributions by the latter might not exhibit all of the

evil that contributions by traditional economically organized corporations exhibit.") (internal

quotations omitted).  In Beaumont, the Court observed that it has specifically rejected the argument

that "deference to [legislative] judgments about proper limits on corporate contributions turns on

the details of corporate form of the affluence of particular corporations."  Beaumont, 539 U.S. at

157.

      C.     Is the Prohibition on Contributions Closely Drawn?

      Plaintiffs also argue that the prohibition on covered entities is not closely drawn.

Plaintiffs argue that it is overinclusive and point out that the Federal Election Commission (the

"FEC") permits such entities to make campaign contributions.  Plaintiffs further argue that the

regulation is underinclusive because it exempts contributions from doctors, lawyers, and CPA's

from the prohibition.  Finally, Plaintiffs argue that the regulation is overbroad because it burdens

more free speech and associational rights more heavily than is justified by the anti-corruption

interest.

The Court finds none of Plaintiffs' arguments persuasive.  Congress's decision to limit the FEC's entity restrictions to corporations does not render local regulation of other entities' contributions unconstitutional.  As the <u>Buckley</u> Court recognized, the legislature may institute reform in different phases, and "need not strike at all evils at the same time."  <u>Buckley</u>, 424 U.S. at 105.  The fact that Congress and the City of New York have chosen to address different phases of the corruption and circumvention problem at different speeds does not render one approach overinclusive as compared to the other.

Plaintiffs' argument regarding coverage of doctors and other professionals seems to have been prompted by a provision of the CFA that negates any presumption that a contribution by an individual whose name is followed by a professional designation, including but not limited to "M.D.," "Esq." or "C.P.A.," comes from a corporation or covered entity, absent further indicia that the contribution is from such an entity.  Plaintiffs proffer no rationale as to why contributions from such individuals, as opposed to contributions from covered entities of which such individuals are members or owners, should be banned.  The titles on which the provision is focused are personal ones indicative of professional achievement and have nothing to do with corporate form.  As Defendants point out, this provision recognizes that many individuals with personal professional titles use those titles on personal accounts, and thus appear on checks conveying individual contributions.  Treating such contributions as presumptively prohibited as contributions from covered entities could greatly hinder individual contributors making valid campaign contributions.  Thus, the Court finds that this provision is not evidence of unconstitutional underinclusiveness.  Rather, the provision serves simply to prevent the inappropriate application of entity restrictions to individuals.

Nor is the challenged covered entity provision overbroad.  To the extent that

Plaintiffs argue that the provision is overbroad because it restricts or prohibits contributions from entities which would never contemplate attempting to buy influence, this argument is unavailing. As discussed in connection with Plaintiffs' overbreadth challenge to the lower "doing business" limits, the Supreme Court rejected a nearly identical overbreadth argument in <u>Buckley</u>.  Assuming that most of the contributors falling within the scope of the challenged provisions did not seek improper influence, the <u>Buckley</u> Court identified the difficulty in isolating suspect contributions and concluded that Congress's interest in eliminating the <u>appearance</u> of impropriety justified elimination of the opportunity for abuse.  <u>Buckley</u>, 424 U.S. at 29-30.  As in <u>Buckley</u>, the purpose of the challenged covered entity provisions is to eliminate the appearance of impropriety as well as actual attempts to buy influence.  Plaintiffs' overbreadth challenge therefore fails.

Not only does the Court find Plaintiffs' assertions of over- and underinclusiveness and overbreadth unpersuasive, the Court finds that the challenged provision has been closely drawn to address the asserted anti-corruption and anti-circumvention interests.  The provision reaches entities that, like corporations, have the potential for aggregating contributed wealth and profits from business operations.  The covered entities may be used as a means of obscuring the original source of the contribution, particularly as there is often little publicly available information about some of the covered entities' principals or owners.  (<u>See</u> Loprest Decl. ¶ 32.)  Additionally, as discussed in connection with the underinclusiveness argument, the ban does not prevent individual members of the covered entities from making individual contributions.

Because the Court finds that Defendants have proffered a sufficiently important governmental interest to justify expansion of the prohibition on corporation contributions to encompass covered entities, and the provision is closely drawn to that interest, Plaintiffs' facial challenge to the constitutionality of section 3-703(1-l) fails.

## CONCLUSION

For the reasons explained above, Plaintiffs have failed to demonstrate that they are entitled to succeed on the merits of the facial constitutionality issues raised in their application for injunctive relief. Furthermore, there are no material issues of disputed fact and, as explained above, Defendants are entitled as a matter of law to summary judgment on those facial constitutionality chalims. Accordingly, Plaintiffs' application for preliminary and permanent injunctive relief on those aspects of Counts II, III, IV, VII, VIII and IX of the Amended Complaint that assert that the lower "doing business" contribution limits, the exclusion from matching of contributions from "doing business" contributors from relatives and employees of lobbyists, and the extension of the corporate contributions ban to LLCs, LLPs and partnerships are facially violative of the First and Fourteenth Amendments of the Constitution of the United States is denied, and Defendants' motion for summary judgment dismissing those aspects of those Counts is granted. The Clerk of Court is respectfully requested to terminate docket entry nos. 15 and 46.

Dated: New York, New York
      February 6, 2009

LAURA TAYLOR SWAIN
United States District Judge